FENNEMORE CRAIG, P.C.
Cathy L. Reece (005932)
Keith L. Hendricks (012750)
3003 N. Central Ave., Suite 2600
Phoenix, Arizona 85012
Telephone: (602) 916-5343
Facsimile: (602) 916-5543
Email: creece@fclaw.com
Email: khendricks@fclaw.com

Attorneys for Textron Financial
Corporation

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| ILX RESORTS INCORPORATED, et al., | Case No. 2:09-bk-03594-RTB<br>Case No. 2:09-bk-03595-RTB<br>Case No. 2:09-bk-03596-RTB |
| Debtors. | Case No. 2:09-bk-03598-RTB<br>Case No. 2:09-bk-03599-RTB |
| This filing applies to ALL DEBTORS | Case No. 2:09-bk-03600-RTB<br>Case No. 2:09-bk-03601-RTB<br>Case No. 2:09-bk-03603-RTB<br>Case No. 2:09-bk-03604-RTB<br>Case No. 2:09-bk-03605-RTB<br>Case No. 2:09-bk-03606-RTB<br>Case No. 2:09-bk-03608-RTB<br>Case No. 2:09-bk-03609-RTB<br>Case No. 2:09-bk-03610-RTB<br>Case No. 2:09-bk-03612-RTB<br>Case No. 2:09-bk-03617-RTB |
| | Jointly Administered Under:<br>Case No. 2:09-bk-03594-RTB |
| | Hearing Date:  November 10, 2009<br>Hearing Time:  9:00 a.m. |

**TEXTRON FINANCIAL CORPORATION'S
OBJECTIONS TO
DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION**

Textron Financial Corporation ("Textron Financial") creditor and party in interest in the above-captioned case, by and through its undersigned attorneys, hereby files this Objection to Debtors' First Amended Joint Plan of Reorganization (the "Plan").  Textron Financial objects to confirmation of the Plan for the reasons stated herein and requests that the Court deny confirmation of the Plan. In addition, Textron Financial has filed a Motion

for Stay Relief and requests that as a part of the Plan confirmation process the Court modify the Stay as requested. Among other things, the Plan does not meet the requirements of Sections 1129(a) and (b) of the Bankruptcy Code. In sum, Textron Financial has a lien on basically all of Debtors' assets and the Plan would force Textron Financial to finance both the complete post confirmation operations and the payments to all classes of creditors while its own debt continues to grow and its collateral continues to decrease. Further, the Plan makes repayment of Textron Financial and almost all the creditors contingent on the refinance or resale of the Textron Financial collateral in year three of the Plan, which is neither feasible nor realistic in today's economic market. Textron Financial is bearing and financing all the risk of the reorganization. In a number of respects such a result does not meet the requirements of the Bankruptcy Code and the Plan cannot be confirmed.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. FACTUAL BACKGROUND

#### A. The Property And The Loans

Debtors are the owners of, and pledged security interests to Textron Financial in, certain real and personal property located within Arizona, Colorado, Indiana, Nevada, and Mexico, together with consumer notes from the sales of timeshare units, key man life insurance, a cash reserve deposit with a merchant banker, certain contracts and agreements, and the proceeds, products, cash and revenues, etc. of all of the above (the "Property"). In addition, the parties entered into a Servicing Agreement and LockBox Agreement (collectively, "Servicing Agreements"). The Property is described more particularly in applicable loan documents, agreements and other related materials Textron Financial submitted previously to the Court, including documents provided with its Notice of Claim and Motion for Relief From Stay.

Textron Financial's secured interests in the Property are, for ease of reference, denominated as the "Receivables Loan" (Plan at 12:18-19), the "Construction Loan" (referred to in the Plan as the "Mortgage Loan," Plan at 11:10-13), and the "Land Loan"

(referred to in the Plan as the "USFS Land Mortgage Loan" at 12:4-6). All of the documents executed in connection with the Receivables Loan, the Construction Loan, the Land Loan, and the Servicing Agreements are referred to collectively as the "Loan Documents". Textron Financial is the owner of the notes comprising each of the Receivables Loans, the Construction Loans, and the Land Loans and holds the beneficial and other interests under the Loan Documents, which give Textron Financial valid, properly perfected, first priority liens against, and/or direct assignment of, the Property.

**B.      The Debt**

The total owed by Debtors under the Loan Documents as of July 29, 2009 was not less than $28,936,856 plus accruing interest, attorneys fees and costs – reflecting: (i) $11,774,807.19 in principal and $431,333.75 in accrued interest through July 29, 2009 on the Receivables Loan; (ii) $11,065,686.71 in principal and $737,712 in accrued interest through July 29, 2009 on the Construction Loan; (iii) $4,577,873.77 in principal and $349,444.34 in accrued interest through July 29, 2009 on the Land Loan, plus all accruing interest, attorneys fees and costs incurred by Textron Financial (the "Debt"). Included in the Debt is unpaid accrued post petition interest of $1,199,514.40 ("Unpaid Accrued Post Petition Interest").

**C.      The Debtors' Use Of Textron Financial's Cash Collateral**

The Property has value, and post petition, has generated income, rents, profits and proceeds, revenues, fees, charges, accounts or other payments for the use or occupancy of the Property, from the collections of the consumer notes, and from sales of timeshare units (collectively, "Textron Financial's Cash Collateral"). Textron Financial and Debtors have stipulated on several occasions to the use of Textron Financial's Cash Collateral pursuant to certain conditions and terms and the Budgets (the "Cash Collateral Orders"). Pursuant to the Cash Collateral Orders, Debtors have used Textron Financial's Cash Collateral for its operations of the resorts, sales and marketing expenses, corporate overhead, and certain professional fees and administrative expenses. Except on Textron Financial's express consent, the Court has not authorized Debtors' use of Cash Collateral. Pursuant to the

Court's Cash Collateral Orders, Textron Financial was granted Adequate Protection Liens in all of the assets and property acquired by Debtors post petition, the cash reserve deposit with the merchant banker, and a second position lien in three acres of real property located in Sedona, Arizona (junior to M&I's first position lien of approximately $290,000).

### D. Treatment Of Textron Financial's Claim

Under the Plan, Debtors have placed Textron Financial in Class 2A and divided the treatment of the Debt into three parts. For the Land Loan, the Plan has interest set at the Plan Rate of 5% and extends the maturity date to December 31, 2013. Although the Plan provides for the interest-only payments to be made from Textron Financial's Cash Collateral, there will be no debt reduction payments. There is no explanation as to how the Land Loan will be repaid, absent the hypothetical refinancing in the future. Further, the Plan permits that at any point in the future Debtors may simply turn the Land over to Textron Financial as satisfaction of the Land Loan portion of the Debt.[1]

As for the Construction Loan, the Plan proposes "payment" of an annual interest rate of 8½% and a Loan maturity date of December 31, 2012. Significantly, monthly interest of only 4% will be paid and the remaining 4½% will accrue and be added to the Loan balance (with no interest added to that delayed payment). Principal now will be amortized over 20 years. Presumably the Loan will be repaid from the Plan's proposed refinancing or resale. Principal may also be repaid from a certain limited amount per sale of the vacation ownership interests/timeshare units ("VOI Sales") with the rest of the proceeds of the VOI Sales and collateral being used to fund operations and the payments of all other obligations under the Plan. The Debtors do not propose to give Textron Financial the benefit of the Adequate Protection Lien post confirmation for the Construction loan but rather to return Textron Financial to its pre-petition lien status.

As for the Receivables Loan, the Plan proposes "payment" of an annual interest

---

[1] As is explained more fully in Section III, below, the Land is wholly unnecessary for an effective reorganization. Debtors have shown in the Plan no projections to develop the land nor have they budgeted funds under the Plan for such development. This Land should be released and Textron Financial should be permitted to foreclose on the Land immediately and to apply the proceeds to the Land Loan.

FENNEMORE CRAIG, P.C.

PHOENIX

rate of 8½% and a Loan maturity date of December 31, 2012. Monthly interest of 4% will be paid but the remaining 4½% will accrue and be added to the Loan balance. Principal now will be amortized over 20 years. Unlike the Construction Loan proposal, however, all the sales proceeds and note collections for the pre-petition and post-confirmation sales will be turned over to Debtors and used in their operations and for the payment of all the other obligations under the Plan. Presumably, final repayment of the Receivables Loan will be made from the supposed refinancing or resale anticipated under the Plan. The Debtors do not propose to give Textron Financial the benefit of the Adequate Protection Lien post confirmation for the Receivables Loan but rather to return Textron Financial to its pre-petition lien status.

## II. THE PLAN DOES NOT SATISFY ALL NECESSARY ELEMENTS OF THE BANKRUPTCY CODE AND, THEREFORE, CANNOT BE CONFIRMED

For a Chapter 11 plan to be confirmed, the plan proponent must prove by a preponderance of the evidence that the plan satisfies all of the elements of 11 U.S.C. § 1129. *In re L & J Anaheim Assoc.* 995 F2d 940, 942 (9th Cir. 1993). The plan proponent bears the burden of proof on each element of 11 U.S.C. § 1129(a). *Id.* Here, Debtors have failed to proffer a plan that meets all of the necessary elements of a proper plan, failing to meet requirements of Sections 1129, 1122 and 1123 of the Code. Consequently, the Plan cannot be confirmed. Textron Financial's objections to the Plan are detailed below.

### A. The Plan Improperly Classifies Similarly Situated Creditors Under Section 1122 Without A Proper Business Justification

In an effort to manipulate the classifications to gain confirmation of the Plan, Debtor improperly segregates creditors into separate classes without business justification for such disparate treatment. Section 1122 prescribes classification of claims for a reorganization and requires that claims or interests that are substantially similar be classified together. Textron Financial objects to Debtors' Plan pursuant to Section 1122 because the Plan fails to comply with this requirement by separately classifying similarly situated governmental entities, trade creditors and others.

Fennemore Craig, P.C.

Phoenix

Classes must separately vote whether to approve a debtor's plan of reorganization (11 U.S.C. § 1129(a)(8), (10)), making it imperative that the classification of claims be done with integrity and without manipulation to manufacture a class of approving creditors. In finding that a debtor may not gerrymander classifications to get an affirmative vote on a plan, the Sixth Circuit concluded (and the Ninth Circuit later agreed):

> [I]f § 1122(a) permits classification of "substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the Debtors' motivation to secure the vote of an impaired, assenting class of claims.
>
> * * *
>
> Section 1122 consequently must contemplate some limits on classification of claims of similar priority. A fair reading of both subsections [Section 1122(a) and (b)] suggests that ordinarily "substantially similar claims," those which share common priority and rights against the Debtors' estate, should be placed in the same class. Section 1122(b) expressly creates one exception to this rule by permitting small unsecured claims to be classified separately from their larger counterparts if the court so approves for administrative convenience.
>
> . . . one clear rule that emerges from otherwise muddled case law on § 1122 claims classification: **thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan**. [*emphasis added*.]

*In re Matter of Greystone III Joint Venture*, 995 F. 2d 1274 (5th Cir. 1991), *cert. denied*, 506 U.S. 8221 (1992) *and cert. denied*, 50 U.S. 822 (1992). *See also In re: Holywell Corp.*, 913 F.2d 873 (11th Cir. 1990); *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1313 (8th Cir. 1987). The Ninth Circuit agreed, noting that absent legitimate business or economic justification it is improper to classify similar claims separately. *See In re Barakat*, 99 F.3d 1520 (9th Cir. 1996) (Creditor successful against separate classification of the unsecured portion of a partially secured claim), *cert. denied*, 520 U.S. 1143 (1997) (*citing Oxford Life Ins. Co. v. Tucson Self-Storage, Inc.*, 166 B.R. 892, 897 (9th Cir. BAP 1994)); *In re Johnston*, 21 F.3d 323 (9th Cir. 1994).

"Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly. … Classification of claims thus

FENNEMORE CRAIG, P.C.

PHOENIX

affects the integrity of the voting process, for, if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate 'acceptance' by artful classification." *In re Matter of Greystone III Joint Venture*, 995 F. 2d at 1277. Here, Debtors have created many separate classifications as an artifice in the hopes that they will be able to secure approval of the Plan by at least one purportedly impaired class. Consequently, the Plan cannot be confirmed because it classifies similarly situated creditors into separate classifications without business justification for doing so.

For example, the Secured Tax Claims, Classes 2K through 2S, are not impaired and to the extent that Debtors rely on their votes, their votes should not be counted. Similarly, Debtors have separated the Secured Classes and have artificially impaired Classes 2D, 2H, 2I and 2J so as to create an accepting impaired class. Additionally, the Unsecured Claims are separated into 5 classes, 3A through 3E. There is no business justification for any of these separations and it is apparent that they were devised solely for gerrymandering purposes to obtain an accepting impaired class. These various separate classifications should be disallowed and Debtors should not be permitted to use this ruse for confirmation or cram down purposes.

### B. Pursuant To Section 1123(A)(5), The Plan Fails To Provide Adequate Means For Its Implementation

Textron Financial also objects to Debtors' Plan to the extent that it does not comply with Section 1123(a)(5) of the Code, which mandates that the Plan provide adequate means for its implementation. Debtors' Plan is premised on unrealistic assumptions, unattainable sales projections, an unworkable payment schedules. The Plan simply cannot succeed. It is not sufficient for Debtors to merely layout a delusional strategy for reorganization. Debtors must demonstrate an adequate means for implementation of a Plan that will result in success. Debtors have failed to do so here. A debtor "must demonstrate that any necessary funding or financing has been obtained, or is likely to be obtained," (*In re Trans Max Technologies, Inc.,* 349 B.R. 80, 92 (Bankr.D.Nev. 2006)) and "must offer more than speculation about the source of funding for the plan" (*In re*

*Walker*, 165 B.R. 994, 1003 (E.D.Va. 1994) (*quoting In re Briscoe Enters., Ltd.*, 138 B.R. 795, 807 (N.D. Tex. 1992)).  Simply because Debtors believe that they may be able to find financing down the road that does not necessarily mean that they will obtain new money on acceptable terms or in necessary amounts. Indeed, here, the testimony will establish that such financing is unlikely to occur, and if it does, not in the amounts projected or required.  Accordingly, the Plan does not even demonstrate an adequate means of implementation, much less present a Plan for Debtors' continued viability.[2]

Debtors' Plan is grounded on the delusion that for the next few years it will somehow be able to generate more VOI Sales than it has in the recent past, thereby increasing its receivables and making itself more attractive for a lender to rescue it with refinancing so it can then pay Textron Financial.  Contrary to this rosy picture painted by Debtors, Textron Financial will demonstrate that reality is something quite different. Among other things, the timeshare market has been contracting for several years, the delinquency profiles of the existing consumer loans/Receivables Loan profiles are deteriorating, resulting in the value of the portfolio decreasing over time and projected cash flows decreasing as well, all making these loans an unlikely prospect for refinancing/purchase by a lender in this distressed financial climate.

Debtors must present ample evidence to demonstrate that the [p]lan has a reasonable probability of success." *In re Acequia*, 787 F.2d 1352 (9th Cir. 1986). Moreover, "... where the financial realities do not accord with the proponent's projections or where the projections are unreasonable, the plan should not be confirmed." *In re Sagewood Manor Associates Limited Partnership*, 223 B.R. 756, 762 (Bankr.D.Nev. 1998) (*citing In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex. 1989)). The centerpiece of the Plan is to use Textron Financial's Cash Collateral to pay *all* other

---

[2] Many of the facts resulting in Debtors' inability to prove the Plan has an adequate means for implementation are equally applicable to demonstrating the lack of feasibility of the Plan (Section 1129(a)(11)) and to the Plan being not fair or equitable (Section 1129(b)(2)).  The same flaws in the Plan that Debtors' cannot remedy to show that there is an adequate means of implementation, also render the Plan not feasible and unfair, including the Plan's call provisions for negative amortization of Textron Financial's Claim, the quickly deteriorating consumer loan portfolios in a recession, and the absence of a realistic prospect of a lender to make the projected financing under the Plan.

FENNEMORE CRAIG, P.C.

PHOENIX

creditors for the next three years, while decreasing the value of Textron Financial's Property and simultaneously increasing its Debt, and then sell and/or refinance Textron Financial's Loans in a market where there is no financing available. There is no realistic chance that this Plan can succeed, particularly in light of the distressed financial and real estate markets in which Debtors operate. Notably absent from the Plan is an explanation of an alternative plan to pay Textron Financial if Debtors' panacea of refinancing cannot be undertaken within the time projected.

Debtors propose to use all of Textron Financial's Cash Collateral while making minimal debt service payments, which under the Plan are amortized over 20 years – a period longer than the actual Loans provide, thereby reducing even further the amount of principal going to Textron Financial to reduce the Loans. Textron Financial has a perfected security interest in all but a minimal amount of the cash collateral requested to be used and nearly all the assets described in the Debtors' Plan. It is Textron Financial that will be financing operations and bearing the risk to the betterment all creditors but itself.

This Plan also calls for Textron Financial's collateral to be altered in form at Debtors' discretion as Debtors sell inventory to buyers converting the inventory either into cash that other creditors receive under the Plan or that Debtors use for ongoing operations, or into additional Receivable Loans where there is a deteriorating value evidenced by growing delinquency and/or forfeiture rates on such loans. While Debtors use Textron Financial's Cash Collateral and its Property, Textron Financial must be content with receiving only minimal payments on its Loans, together with interest below market interest rates. Textron Financial is asked to watch as Debtors get further into debt to Textron Financial by negatively amortizing its claims with 4½% of the annual interest accruing rather than being paid. This process would continue for a period of years when Debtors' Plan calls for it to sell or refinance the loans and notes, yet Debtors have produced no evidence of a market for such a transaction.

There is no market for a transaction such as the one proposed by Debtors and there

FENNEMORE CRAIG, P.C.

PHOENIX

is no optimistic outlook for a change in that market within the 3 years in which the Plan requires such a transaction to occur. Based on the state of the negative cash flows and the Debtors' need to use all of the cash collateral for its operations, it becomes crystal clear that there is no business solution that can possibly be proposed by Debtors, absent new financing as they have proposed. The critical component of the Plan is this financing yet it is highly improbable it will occur. Thus, Debtors are unable to establish that they have provided an adequate means of implementing the Plan. The Plan is devoid of details and specificity as to how Debtors plan to accomplish this refinancing/sale that is so pivotal to the success of the Plan.

Moreover, even if a market is available for Debtors in the timeframe under the Plan, the Plan unrealistically anticipates that the consumer notes will increase in value in a declining real estate/time share market and that such notes will be sold at or near face value. Both assumptions are unrealistic in light of the slower than normal sales and with the current delinquency rates on the notes increasing. If Debtors are unable to meet the projected refinancing or sales contained in the Plan – both in terms of the percentage of notes sold to the purchaser or lender **and** the amount the purchaser or lender pays for those notes – the Plan fails. The Plan leaves no margin for error. Second, not only is Textron Financial's debt increasing as a result of the Plan, but its risk also increases due to the inadequacy of the meager payments it receives under the Plan, the below market interest rates being paid to Textron Financial, and the simultaneous conversion of the inventory of timeshare units into notes receivables.

The Plan fails to demonstrate an adequate means of implementation. Textron Financial, therefore, objects to confirmation of the Plan under Sections 1129(a) and 1123.

### C.    The Plan Fails To Satisfy The Requirements Of Section 1129 (A)

"If a plan proponent cannot touch all the bases under § 1129(a), the plan cannot be confirmed and there is no need to test the § 1129(b) factors." *In re First Magnus Financial Corporation*, 2008 WL 450447, 3 (Bankr.D.Ariz. 2008). The Plan here proposed fails the requirements of Section 1129(a). Consequently, the Court never need

reach the Section 1129(b) objections to the Plan. Assuming the Court finds that Section 1129(a) are met, the Plan fails Section 1129(b).

### 1. Failure To Meet Section 1129(A)(2)

The Plan violates Section 1129(a)(2) in that it separately classified unsecured claims and treats those classes differently without the consent of the claim holders. See II.A., above. It is inappropriate to separately classify similarly-situated creditors in gerrymandered classes in the hopes that one of them will throw their support behind the Plan and give Debtors' an accepting impaired class. These result-oriented classifications and treatment of similarly situated claims cannot be countenanced, and must result in the Court's denial of confirmation.

### 2. The Plan Is Not Proposed In Good Faith And, Therefore, Fails To Satisfy Section 1129 (A)(3)

Debtors' Plan fails to comply with Section 1129(a)(3) in that it does not demonstrate that it is proposed in good faith by both the manner in which it attempts to segregate similarly situated creditors into separate classes and in its unrealistic projections. "Bad faith exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors." *In re Sagewood Manor Associates Limited Partnership*, 223 B.R. 756 (Bankr.D.Nev. 1998) (citing In re Boulders on the River, 164 B.R. 99 (9th Cir. BAP 1994)). Similarly, a "...court should recognize that the act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith." *In re Woolley's Parkway Center, Inc.,* 147 B.R. 996, 1003 (M.Fla. 1992); *In re Meadow Glen, Ltd*., 87 B.R. 421, 427 (W.Tex. 1988).

### 3. The Plan Does Not Satisfy The Liquidation Test And, Therefore, Fails To Satisfy Section 1129(A)(7)

Section 1129(a)(7) mandates the Plan be in the "best interests of creditors" by requiring:

(7) With respect to each class--

    (A) each holder of a claim or interest of such class--

        (i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest in property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date....

Textron Financial is not an accepting holder and the Plan is not in the best interests of Debtors' largest creditor, Textron Financial. Textron Financial will not receive the same amount under the Plan that it would under a liquidation. Even assuming the value of the underlying collateral were to stop declining in value and remain constant throughout the Plan's proposed duration, the Plan calls for Textron Financial's collateral to be diminished during the duration of the Plan as its Debt gets larger.

The Plan calls for that part of Textron Financial's collateral that is VOIs or timeshare unit inventory to be converted into cash or notes. Debtors will retain any cash and spend it on operations and payments to other creditors, making only minimal payments to Textron Financial, and the notes are consumer debt likely to be more risky than the secured real and personal property now serving as Textron Financial's collateral. There is no reason to assume that future consumer loans will be any less risky than those already included in the Property, and the existing loan portfolio has a significantly increasing delinquency rate reducing its value as time continues and delinquencies rise.

Moreover, the Plan also proposes negative amortization of Textron Financial's debts, increasing the amount Debtors' owe Textron Financial over the term of the Plan (discussed below). These factors evidence that the value today on liquidation is worth more than Textron Financial can hope to receive under the Plan, even in the remote instance that the Plan can somehow be implemented and completed successfully.

### 4. The Plan Is Not Feasible And, Therefore, Fails To Satisfy Section 1129(A)(11)

"'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" *Pizza of Hawaii, Inc. v. Shakey's, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1984), quoting 5 *Collier on Bankruptcy* ¶ 1129.02[11]

FENNEMORE CRAIG, P.C.

PHOENIX

at 1129-34 (15th ed. 1984). "The feasibility test set forth in §1129(a)(11) requires the court to scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable." *In re Sagewood Manor Associates Limited Partnership*, 223 B.R. 756, 762 (Bankr.D.Nev. 1998). "[T]he feasibility test contemplates the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985).[3]

In considering whether a particular plan is feasible, courts have considered the following factors: "(1) adequacy of the debtor's capital structure; (2) earning power of its business; (3) conditions; (4) ability of the debtor's management; (5) probability of the continuation of the same management; and (6) related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Wiersma,* 324 B.R. 92, 113 (9th Cir. BAP 2005), *aff'd in part, rev'd in part*, 483 F.3d 933 (9th Cir. 2007), *aff'd*, 227 Fed.Appx. 603 (9th Cir. 2007) (*citing In re Sagewood Manor*, 223 B.R. at 763); *In re Trans Max Technologies, Inc.*, 349 B.R. 80, 92 (Bankr.D.Nev. 2006).

As with any other confirmation requirement, the plan proponent must demonstrate its satisfaction by a preponderance of the evidence. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd. P'ship*), 115 F.3d 650, 653 (9th Cir. 1997), cert. denied, 522 U.S. 1110 (1998). The inquiry here, thus, is whether Debtors have sufficiently established their post-confirmation viability, and their ability to meet future obligations. Particularly important in this regard is that Debtors demonstrate that any necessary financing or funding has been obtained, or is likely to be obtained – "[t]he debtor must offer more than speculation about the source of funding for the plan." *Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1003-05 (E.D. Va. 1994); *In re*

---

[3] As noted above, the reasons Debtors are unable to establish an "adequate means of implementation" are equally applicable to their inability to establish the feasibility of their Plan. Those reasons will not be repeated here but are incorporated by this reference.

FENNEMORE CRAIG, P.C.

PHOENIX

*Made in Detroit, Inc.* 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003); *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985); *In re Walker*, 165 B.R. at 1003; *In re Made in Detroit, Inc.*, 299 B.R. at 176. With or without this financing, however, "'section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.'" *In re Trans Max Technologies*, 349 B.R. at 92 (*citing S & P, Inc. v. Pfeifer*, 189 B.R. 173, 187 (N.D. Ind. 1995), *quoting In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993), aff'd, 78 F.3d 587 (7th Cir. 1996)). A plan may not be confirmed if it is not feasible, regardless of the sincere and honest intentions of the proponent. *In re Clarkson*, 767 F.2d at 420. *See Tennessee Pub. Co. v. American National Bank*, 299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. 13 (1936), cited in 5 *Collier on Bankruptcy*, (15th ed. 1988) para. 1129.02[11] at 1129-36.11 n. 96.

In this instance, the Plan does not explain how refinancing will be obtained. The Plan does not indicate that there is any prospective lender for the sale or financing. The Plan does not present any alternative, much less a viable one, if its projected refinancing either does not occur or does not generate sufficient proceeds from the Loans to fully satisfy Textron Financial's ever-increasing Debt. Indeed, contrary to the expectations set forth in the Plan, there is little or no market for the refinancing and cash infusions upon which Debtors' Plan relies for feasibility. The consumer notes, if and when they might be able to be sold, are decreasing in value due to the increasing delinquency rates and the dissipation of the collateral, thereby making them decrease in value over time. Hence, Debtors do not have a realistic chance of having the amount needed to pay Textron Financial's Debt, once that day finally arrives under the Plan.

Summarily, the Plan forces Textron Financial to accept risks, without consideration or justification, it had not otherwise assumed under the Loan Documents With Debtors' providing such a paucity of information regarding their actual ability to pay Textron Financial's Debt when it is due and without realistic strategies identified for success, the Plan is not feasible and cannot be confirmed. *See* Section 1129(a)(11).

**D.    The Plan Results In The Substantive Consolidation Of All The Debtors**

In violation of the Bankruptcy Code, the Plan treats all of Debtors' assets and liabilities as one and uses the collective revenues of the Debtors as though they are commingled with one cash management system to pay all the Debtors' creditors.  Yet no evidence on substantive consolidation and no request for substantive consolidation have been made.   The creditors of all of the Debtors, including Administrative, Secured, Secured Tax and Unsecured Creditors, are paid and treated in a fashion that provides payment in full of their claims from a collective pool of assets.  No liquidation analysis is provided by Debtors that would indicate how much Debtor by Debtor their respective creditors are entitled to.  Rather Debtors treat all revenues as if commingled for purposes of the Plan.  Some creditors, therefore, may be receiving more than they would receive in a liquidation and are unjustly enriched, while others may be receiving less than they would otherwise receive and unjustly underpaid.  Similarly, other creditors and equity holders are retaining all the value for themselves regardless of the entity in which they hold a claim or equity interest. This substantive consolidation, without sufficient procedural steps, is another aspect of the Plan that should not be confirmed.  For the substantive consolidation to be appropriate, Debtors should have either expressly requested it in the Plan or in a motion.  11 U.S.C. § 1123(a)(5)(C).  Neither was done but the Plan is implemented as if substantive consolidation has been approved.

**E.    The Plan Fails To Meet Section 1129(B)(1) And (B)(2) Because It Discriminates Unfairly, Is Not Fair And Equitable Due To Several Factors, Including The Low Interest Rates, Its Negative Amortization Of Textron Financial's Debt, And Its Failure To Give Textron Financial The Indubitable Equivalent Of Its Claim**

Bankruptcy Code § 1129(b)(1) provides that if all the requirements of Section 1129(a) have been met, other than the acceptance of the proposed plan as required by Section 1129(a)(8), the plan, upon the request of the plan proponent, may be confirmed if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1);. *In re Arnold and Baker Farms*, 177 B.R. 648 (9th Cir. BAP 1994), *aff'd*, 85

FENNEMORE CRAIG, P.C.

PHOENIX

F.3d 1415 (9th Cir. 1996), *cert. denied*, 519 U.S. 1054 (1997). The bankruptcy court "must consider the entire plan in the context of ... the particular facts and circumstances [of the case]." *In re D & F Construction, Inc*., 865 F.2d 673, 675 (5th Cir. 1989).

The two requirements for cram down under Section 1129(b)(2) are that the plan (A) treat each objecting impaired class fairly and equitably, and (B) not discriminate unfairly against any objecting impaired class. The §1129(b)(2)(A) provisions specify that a fair and equitable plan provide one of the following three alternatives for the holders of secured claims: (i) retention of the lien and deferred cash payments totaling the value of the interest, (ii) sale with the lien attaching to the proceeds, or (iii) realization of the indubitable equivalent of the secured claim.[4] *See* 11 U.S.C. § 1129(b)(2)(A)(i)-(iii). Provisions (i) and (iii) are not met by the proposed Plan.

Textron Financial's collateral consisted of, among other things, vacation ownership interests/timeshare units and the cash and loan proceeds from VOI Sales of those interests. The Plan is not fair and equitable because Textron Financial is not receiving either the deferred cash payments equivalent to its Claim value nor is it receiving the indubitable equivalents of its Claim. The Plan shifts all the risk to Textron Financial – using its Cash Collateral to finance all or other creditors and Debtors.

  1.  **The Plan Is Not Fair And Equitable In Using Textron Financial's Collateral To Pay All Other Creditors, Including Junior And Unsecured Creditors, Before Payment Of Textron Financial's Own Claim**

Section 1129(b) requires, among other things, that a plan be fair and equitable and not discriminate unfairly among similarly situated creditors. A plan is fair and equitable if a priority creditor receives full value for its claim or, if it does not receive full value, that the holder of any junior claim will not receive any property on account of such junior claim. The "fair and equitable" condition includes the requirement that the holder of a secured claim receive "deferred cash payments totaling at least the allowed amount of

---

[4] As with Debtors' inability to establish that the Plan has an adequate means for implementation and that it is not feasible, the negative amortization, diminishing collateral, increasing delinquency rates and related items demonstrate the reasons why Textron Financial is not receiving under the Plan what is fair and equitable and the indubitable equivalent of its Claim.

FENNEMORE CRAIG, P.C.

PHOENIX

such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). Specifically, "[c]ourts have stated that in general a plan is not fair and equitable with respect to secured creditors when the plan unduly shifts the risks of a successful reorganization to those creditors. *In re Hand*, 2009 WL 1306919, 17 (*citing In re Crown Oil, Inc.*, 16 Mont. B.R. 534, 539 (Bankr.D.Mont. 1998). This Plan should not be confirmed because it shifts the burdens of a successful reorganization to Textron Financial.

The Plan calls for Textron Financial's collateral to be sold to consumers and in the meantime for nearly all proceeds from those consumer sales to be used to fund operations and to pay creditors other than Textron Financial, including those junior to Textron Financial. The Plan puts Textron Financial in a position of watching while its Debt from Debtors increases with the accruing interest Debtors cannot pay. The Plan forces Textron Financial to watch its collateral dissipate through Debtors exchanging it for more risky consumer loans or for cash not paid to Textron Financial. Although Debtors indicate that the Notes themselves will be pledged to Textron Financial, the Plan clearly provides that all of the collections, from down payments and monthly payments, will be turned over for three years to Debtors. The Plan sets up Textron Financial to receive miniscule fixed payments with below market interest, and to watch the rest of Debtors' promised "interest payments" continue to accrue and further increase Debtors' debt to Textron Financial, all the while having Debtors pay other creditors.

Textron Financial is asked to wait many years for "full" payment down the road when a hypothetical lender might be willing to finance Debtor to get cash sufficient to pay Textron Financial. Although notably absent is any concrete evidence that a financing will be feasible when called for in the Plan. Moreover, if that hypothetical lender either chooses not to lend to Debtors or even chooses to lend a more realistic amount (and, no doubt, one substantially less than that contemplated in the Plan), Textron Financial does not get paid, but the other creditors, including those junior to Textron Financial, have been

1  receiving payments under the Plan.  This is not fair and equitable.  The Plan, because it is
2  not fair and equitable, does not meet the requirements of Section 1129(b)(2)(A)(i).

3      **2.    Negative Amortization Of Textron Financial's Claim Renders**
        **The Plan Not Fair And Equitable And Textron Financial Does**
4      **Not Receive Sufficient Deferred Cash Payments On Its Claim**

5          The "fair and equitable" condition includes the requirement that the holder of a

6  secured claim receive "deferred cash payments totaling at least the allowed amount of

7  such claim, of a value, as of the effective date of the plan, of at least the value of such

8  holder's interest in the estate's interest in such property."  11 U.S.C. § 1129(b)(2)(A)(i)(II).

9  The Plan's negative amortization of Textron Financial's debt also renders the Plan not fair

10  and equitable because this treatment results in an ever-increasing amount of Textron

11  Financial's debt while other creditors have their debts paid off using funds generated by

12  Textron Financial's collateral.  With these unsound legs as its foundation, the Plan

13  violates Section 1129(b)(2)(A)(i)(II) and cannot be confirmed.

14          Negative amortization refers to "'a provision wherein part or all of the interest on a

15  secured claim is not paid currently but instead is deferred and allowed to accrue,'" with

16  the accrued interest added to the principal and paid when income is higher.  (*Citations*

17  *omitted.)* The extent of negative amortization depends upon the difference between the

18  "'accrual rate,'" or the overall rate of interest to be paid on a claim, and the "'pay rate,'"

19  or the rate of interest to be paid on a monthly basis.  *(Citations omitted.)*  Even when a

20  debtor defers payments of interest on its debt obligation, the deferred amount can be

21  capitalized at a rate of interest which enables the deferred amount to equal the present

22  value of the creditor's allowed secured claim.'"  *Great Western Bank v. Sierra Woods*

23  *Group*, 93 F.2d 1174, 1175 (9th Cir. 1992) (*citing In re Club Associates,* 107 B.R. 385,

24  398 (Bankr.N.D.Ga. 1989)); *see also In re Memphis Partners, L.P.,* 99 B.R. 385, 388

25  (Bankr.M.D.Tenn. 1989) (only with an appropriate interest rate can a negative

26  amortization plan mathematically provide present value).

27          Textron Financial asserts that what little equity cushion Textron Financial had

28  when the Petition was filed is quickly diminishing and that the effect will be accelerated

with the negative amortization proposed under the Plan, coupled with Debtors' continued operations at a deficit each month. The Plan provides no viable alternative to remedy the Debtors' current situation, and the value of the Receivables Loan in Debtors' hands will continue to decrease because the delinquency profile of the portfolio has nearly doubled in the recent months and is projected to continue in that direction. The Plan does not account for this or recognize that increases in delinquency rates decrease the value of the consumer notes portfolio, likely in an amount more than the projected offsets caused by new sales.

The Ninth Circuit, speaking about several cases addressing plans where negative amortization was a component, concluded:

> In all of the above cases, save one, the court concluded that negative amortization was not fair and equitable under the circumstances, and the case approving of the deferral of interest concerned a contract that already provided for negative amortization. *In re Club Assoc.*, 107 B.R. at 398. Thus while most courts have been reluctant to adopt a per se rule against negative amortization, there are commonly held reservations about the practice. That is not surprising because plans of that type tend to be fraught with pitfalls that unfairly endanger creditors. …

*Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1177 (9th Cir. 1992). Some of the factors relevant to this determination are:

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the Debtors' financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against

plan failure.

*In re Apple Tree Partner,* 131 B.R. 380, 398 (Bankr. W.D.Tenn. 1991). The Ninth Circuit agreed that these are relevant factors to consider when determining whether a plan that calls for negative amortization is fair and reasonable. *See Sierra Woods Group*, 953 F.2d at 1178.

Of the factors listed above, the Debtors have failed to establish suitable responses to most. Notably, the Plan does not provide for market rate of interest, current payments of interest or the present value of deferred payments; Debtors' financial projects are not reasonable or sufficiently proven and the Plan is not feasible; the value of the collateral is decreasing as Debtors convert timeshare units into risky consumer notes and cash spent on operations; the risks are all shifted to Textron Financial while other, more junior creditors are paid; the Plan precludes Textron Financial from foreclosing on its interests and retaining another management company to operate its properties; and there are no safeguards in place to stave off a failure when, in the most likely scenario, Debtors are unable to secure a lender for the substantial financing key to the Plan's success. In a similar plan, one court held:

> The plan does not require satisfactory monthly payments. It contemplates minimal payments of interest only from net operating income, after payment of all operating costs. The interest rate for the interim payments is below market rate and, at least in the early years of the plan, below contract rate. The plan rate never exceeds the original contract rate, which is below the current market rate. The proponents contemplate a significant increase in the value and marketability of the properties at the end of 1991. The owners seek to put the lienholders on hold over their objections for over three more years in the hope that the market will improve, allowing the lower ranked residual owners to sell the investments at a profit."

*In re Lakeside Global II, Ltd.*, 116 B.R. 499, 508 (Bankr.S.D.Tex. 1989). The court was not convinced that the plan's predicted sale or refinancing of the real property assets at certain minimum values would occur as projected by the plan, with the reasoning equally applicable here:

> Under the proposed plan, the lenders retain their liens, satisfying § 1129(b)(2)(A)(i)(I). Cash payments are to be made. However, the payments are a minimum, interim action, designed not to pay down the total debt, thus failing to satisfy § 1129(b)(2)(A)(i)(II). A sale or refinancing in

FENNEMORE CRAIG, P.C.

PHOENIX

the future, as provided for in the plan, is speculative and seriously risks the safety of the positions of the lienholders. In the event of default, the plan provides for the turnover of the property to the lienholder.

It would seem to this court that somehow the secured creditor must be sufficiently compensated from something other than interim rental income payments plus a buyout at the end of 1991. This does not satisfy the requirement of § 1129(b)(2)(A)(i)(II) that each holder of a secured claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. Since this is what the plan proposes while leaving value with residual claimants who are to become the new owners and because the plan proposes to pay all unsecured claimants in full in cash at the effective date of the plan, it violates the absolute priority rule and cannot be confirmed.

If a new lender were to lend on these projects, the court is satisfied that it would not lend on the interim payment, interest rate structure, and balloon terms contemplated by this plan. Because the lienholders are being denied their rights under the Code to receive the value of their interests in their collateral, § 1129(b)(2)(A)(i) is not satisfied. The plan does not satisfy any of the cramdown alternatives and may not be confirmed on the basis of § 1129(b).

*Id*. at 513-15. "To determine whether a secured creditor has been provided the present value of its claim, the bankruptcy court must make a case-by-case determination of what interest the reorganizing debtor would have to pay a creditor in order to obtain a loan on equivalent terms in the open market." *In re Camino Real Landscape Maint. Contractors*, 818 F.2d 1503, 1508 (9th Cir. 1987); *In re Patterson*, *supra*, 86 B.R. at 228.

Further, the Plan does not provide for Textron Financial to receive the "present value" of its Claim. In order to provide the "present value" of an allowed secured claim, "the plan must provide for the payment of interest on any deferred payments to the creditor at a rate that will allow the creditor to receive the present value of its allowed secured claim. To determine whether a secured creditor has been provided the present value of its claim, the bankruptcy court must make a case-by-case determination of what interest the reorganizing debtor would have to pay a creditor in order to obtain a loan on equivalent terms in the open market." *In re Hotel Associates of Tucson*, 165 B.R. 470, 476 (9th Cir. BAP 1994) (referencing *In re Camino Real Landscape Maintenance Contractors*, 818 F.2d 1503, 1504 (9th Cir. 1987). Here, Textron Financial will not

FENNEMORE CRAIG, P.C.

PHOENIX

receive the present value of its Claim under the Plan as the Plan provides for (i) below market current interest payments, (ii) negative amortization, (iii) no realistic plan for refinancing or funding, and (iv) collateral with deteriorating value. The Plan, including the negative amortization, is not fair and equitable and it should not be confirmed.

### 3. Textron Financial is Not Receiving Its Deferred Cash Payment as the Interest Rate is Too Low and Does Not Constitute Market Rate

On the Land Loan, the Debtors propose to pay the Plan Rate of 5% per annum and on the Receivables Loan and Construction Loan the Debtors propose a rate of 8½% per annum as interest, but offer to pay only 4% and accrue the remaining 4½%. Both rates are not market rates and will not provide Textron Financial with its deferred cash payments as required under Section 1129(b) so as to satisfy the Plan requirements.

### 4. In Violation of Section 1129(b)(2)(A)(iii), Textron Financial Is Not Receiving the Indubitable Equivalent of Its Claim

"Indubitable means too evident to be doubted." *In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996). "Where a creditor is not receiving all of its collateral, it is a rare case in which the creditor will have received the indubitable equivalent of its claim. Any such plan is subject to extremely close scrutiny to insure that the creditor will actually receive the indubitable equivalent of its secured claim." *In re AHB I, LLC*, 2009 WL 755280 (Bkrtcy.N.D.Cal. 2009) (citing *In re Arnold & Baker Farms*, 177 B.R. 648 (9th Cir. 1994). When discussing "indubitable equivalent, one Court put it this way:

> The phrase itself was coined by Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935). In rejecting a plan, Judge Hand stated: "it is plain that adequate protection must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him that in the interest of the junior holders, unless by a substitute of the most indubitable equivalence.

*In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 433-34 (Bankr.C.D.Ca. 1993).

The Debtors' burden to present ample evidence to demonstrate that the Plan has a reasonable probability of success weighs into the indubitable equivalent evaluation, in that

". . . where the financial realities do not accord with the proponent's projections or where the projections are unreasonable, the plan should not be confirmed." *In re Sagewood Manor Associates Limited Partnership*, 223 B.R. 756, 762 (Bankr.D.Nev. 1998) (*citing In re Acequia*, 787 F.2d 1352 (9th Cir. 1986) and *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex. 1989). That court aptly noted:

> Where there is non-consensual confirmation, a payment stream with a present value of less than the allowed amount of the claim does not satisfy the indubitable equivalent standard. . . . Thus, if a plan proposes a below market interest rate for a deferred stream of payments equal to the allowed amount of the claim, not only will the treatment fail clause (i), but will fail clause (iii) as well.

*In re Sagewood Manor Associates Limited Partnership*, 223 B.R. at 771-72.

The long deferred payment of a creditor's claim is not the indubitable equivalent; Debtors' Plan calls for payment to Textron Financial of a below market interest rate for the course of the Plan, plus a deferred amount of interest insufficient to meet the present value of the Claim. The Plan does not provide Textron Financial with the indubitable equivalent of its Claim, thereby failing Section 1129(b)(2)(A)(iii).

### 5. The Plan Discriminates Unfairly Against Textron Financial

The Plan discriminates unfairly against Textron Financial. The proceeds of its collateral are used throughout the life of the Plan to pay all the other creditors and obligations under the Plan as well as to fund ongoing operations. Textron Financial is forced through the Plan to bear all the risk of the operations and the repayment of the other creditors. All the risks of the value of the collateral and the continued sales fall fully on Textron Financial. While other creditors, especially the Administrative, Secured Tax and Secured Claims are being paid from the proceeds of Textron Financial's collateral, Textron Financial is forced to accrue most of its interest payments thus increasing its Debt. Further, the collateral of Textron Financial will be sold off on a regular basis yet none of the collections from the down payments or the collections of the receivables will be paid to Textron Financial to reduce the Loans or the reduction in value of the collateral. Rather, these proceeds of collections will be used for the continued operations and the

repayment of the other creditors under the Plan.

This shifting of all the risk to Textron Financial discriminates unfairly upon Textron Financial and makes the Plan unconfirmable. None of the other creditors face the same risk or reduction of collateral. All other Secured Creditors retain their liens but rather than being paid from the proceeds of their own collateral are paid from the proceeds of Textron Financial's collateral. Monthly interest and principal payments are made from Textron Financial's collateral proceeds to all other Secured Creditors but their collateral also remains in tact, effectively giving them senior priority over Textron Financial. This is yet another violation of Section 1129(b)(2) and calls for the Plan not to be confirmed.

### 6. The Plan Violates The Absolute Priority Rule

The Plan violates the Absolute Priority Rule because the Debtors propose to use the proceeds of Textron Financial's collateral throughout the life of the Plan to pay all the other creditors and obligations under the Plan as well as to fund ongoing operations prior to satisfaction in full of Textron Financial's Debt. There are designated time periods under the Plan when creditors junior to Textron Financial will be paid in full (ostensibly with Textron Financial's Cash Collateral) prior to the satisfaction of the Debtors' obligations to the senior claims of Textron Financial. These violations of statutory priorities occur while Textron Financial is asked to continue accruing interest it is owed all the while the Debtors' aggregate Debts continue to increase.

### 7. The Plan Ignores The *LaSalle* Requirements

The Plan does not provide for exposure of Debtors' assets and business to the marketplace as contemplated by *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership*, 118 S. Ct. 1674 (1998), rev'd, 526 U.S. 434 (1999). The *LaSalle* court prohibited confirmation of a plan where equity provided some new value without first permitting the secured lender to propose an alternative disposition of the property, or allowing third parties to make competing offers. Here, the Plan provides that equity holders retain their interests without providing any new value while denying Textron Financial the option of an alternative disposition of the estates' assets subject to its

FENNEMORE CRAIG, P.C.

PHOENIX

security interests and without allowing third parties the option of making competing offers. Without following these strict requirements of *LaSalle*, the Court cannot confirm the Plan.

Following the *LaSalle* rationale (and assuming all other shortcomings of the Plan were resolved) the Plan cannot be confirmed unless the equity holders and junior claim holders "contribute new capital in money or money's worth, reasonably equivalent to the property and the equity holder's value, and necessary for successful reorganization of the restructured enterprise." 526 U.S. at 442.

Here, neither occurs. Neither the junior claim holders nor equity holders contribute anything and no exposure to the market has been provided. For these additional reasons, the Plan cannot be confirmed.

## III. THE COURT SHOULD GRANT RELIEF FROM THE AUTOMATIC STAY UNDER SECTION 362(D)(1) AND (2) TO ALLOW TEXTRON FINANCIAL TO ENFORCE ITS LIENS AGAINST THE PROPERTY.

If the Court denies confirmation of the Plan for any reason, Textron Financial requests that it be granted relief from the automatic stay under Section 362 and be allowed to enforce its liens against the Property.

Sections 362(d)(1) and (2) provide two independent grounds for relief from the stay imposed under Section 362(a). *See In re Sun Valley Ranches, Inc.*, 823 F.2d 1373, 1376 (9th Cir. 1987) (provisions for relief under Section 362(d) are disjunctive, and relief may be granted if only one provision applies); *In re Duvar Apt., Inc.*, 205 B.R. 196, 200 (Bankr. 9th Cir. 1996) (each subsection of Section 362(d) provides an independent alternative for the Bankruptcy Court to grant relief from the stay). Pursuant to Section 362(g), Debtors bear the burden of proof on all issues arising under Section 362(d), except the issue of its lack of equity in the Property. Specifically, "the debtor retains the burden of proving lack of cause under Section 362(d)(1). . . ." *In re Gauvin*, 24 B.R. 578, 580 (Bankr. 9th Cir. 1982). As shown herein, Debtors cannot meet the burden of proof under Section 362(d). Accordingly, Textron Financial is entitled to relief under Sections 362(d)(1) and (2).

**A.    The Court Should Grant Stay Relief Under Section 362(D)(1), Because Textron Financial's Interest In The Property Is Not Adequately Protected**

Pursuant to Section 362(d)(1), relief from the automatic stay shall be granted "for cause", which includes (but is not limited to) the lack of adequate protection.   If the Debtors cannot prove that Textron Financial is adequately protected, then Textron Financial is entitled to stay relief for cause.  *See In re Mellor*, 734 F.2d 1396, 1400-01 (9th Cir. 1984); *In re Mallas Enters., Inc.*, 37 B.R. 964, 967 (9th Cir. BAP 1984); *In re Jordan*, 392 B.R. 428, 447-48 (Bankr.D.Idaho 2008).   As shown herein, Textron Financial's interest in the Property is not adequately protected and there is cause for stay relief, for several independent reasons.

First, Section 361 sets forth three non-exclusive means of providing adequate protection:  (1) periodic cash payments (or a lump sum cash payment); (2) additional or replacement liens; or (3) the realization of the "indubitable equivalent" of the secured creditor's claim.  Debtors have not made any meaningful payments to Textron Financial. Although Textron Financial has been granted replacement liens in all estate property for the use of its cash collateral, as set forth above, the use of the cash collateral actually will result in a significant operating loss--or a reduction in the assets available to satisfy Textron Financial's claim.  Debtors do not have any other assets against which Textron Financial can be granted an additional or replacement lien.  Further, Debtors have not offered Textron Financial the "indubitable equivalent" of its secured claim.  Accordingly, this alone demonstrates Textron Financial's interest in the Property is not adequately protected.

Second, Textron Financial's secured claim is not adequately protected by an "equity cushion".  The testimony will show what little equity cushion that exists is rapidly deteriorating.  In this regard, an "equity cushion" is another traditional form of adequate protection.  Courts generally have held that a 20% equity cushion is necessary to provide adequate protection to the secured creditor, particularly (as here) where no adequate protection payments are being made to the creditor.  *See In re Mellor, supra* at 1400-01;

FENNEMORE CRAIG, P.C.

PHOENIX

*In re Jug End in the Bershires, Inc.*, 46 B.R. 892, 899 (Bankr. D. Mass. 1985). As shown above, and as will be demonstrated by Textron Financial's expert witnesses, Debtors argue that there is a significant equity cushion in the Property, but that is incorrect. Accordingly, Textron Financial's interest in the Property is not adequately protected.

Finally, Textron Financial is entitled to adequate protection against any decrease in the value of its collateral while the bankruptcy is pending. *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L.Ed.2d 740 (1988); *Matter of Rupprect*, 161 B.R. 48, 49 (Bankr. D. Neb. 1993) ("An undersecured creditor lacks adequate protection of its interest where its interest in the debtors' property is decreasing in value."); *In re Woolley's Parkway Center, Inc.*, 147 B.R. 996, 1001 (Bankr. M.D. Fla. 1992) ("an undersecured creditor is not entitled to adequate protection unless it is able to show decrease in value of its collateral, *i.e.*, economic depreciation of the property, caused by the passage of time"). In our case, the value of the Property is decreasing during the pendency of the bankruptcy case and the consumer notes and the inventory are being dissipated daily and not replaced. Also, Debtors' continued use of Textron Financial's Cash Collateral over the last few months has further depleted the value of Textron Financial's Property.

Debtors continue to suffer loses in operations and cash flow and they cannot be expected to successfully reorganize, but are increasing dissipating Textron Financial's collateral and increasing its debt each day. This is sufficient basis to grant Textron Financial relief from the stay if the Plan is not confirmed. *See In re Garofalo's Finer Foods, Inc.*, 117 B.R. 363, 372 (Bankr. N.D. Ill. 1990) ("The secured creditors have effectively borne the post-petition losses from the Debtors' continued operations. They should not be expected to continue to subsidize post-petition operations at a loss . . . ."); *Matter of GWF Investments, Ltd.*, 32 B.R. 308, 310 (Bankr. S.D. Ohio 1983) (In addition to appraised values, cause and lack of adequate protection takes into account monetary losses from unprofitable management both before and since the filing of bankruptcy).

The bottom line is that Textron Financial's interest in the Property is not

adequately protected, and further delay in granting relief from the stay is detrimental to Textron Financial. Accordingly, the Court should grant relief from the automatic stay for cause under Section 362(d)(1).

### B. The Court Should Grant Stay Relief Under Section 362(D)(2), Because (1) There Is No Equity In The Property; And (2) The Property Is Not Necessary To An Effective Reorganization.

Under Section 362(d)(2), the Court must grant relief from the automatic stay, if: (i) the debtor has no equity in the property; and (ii) the property is not necessary to an effective reorganization. *See In re Casgul of Nevada, Inc.*, 22 B.R. 65, 66 (9th Cir. 1982). Both requirements for relief under Section 362(d)(2) are satisfied here.

First, Debtors have very little equity in the Property. In determining whether there is equity in the Property, the valuation of the Property must be reduced by an amount sufficient to cover Textron Financial's estimated costs and fees incurred in liquidating the Property. *See La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283, 289 (Bankr. S.D. Cal. 1982). As shown above, even without considering the liquidation costs, Debtors cannot show that there is equity in the Property. As such, the first element for relief under Section 362(d)(2) is satisfied.

Second, if the Plan is not confirmed then the Property is not necessary to an effective reorganization. In this regard, the Debtors must show both that the Property is necessary to effect a reorganization and that there is a reasonable possibility of a successful reorganization within a reasonable time. *See United States Association of Texas v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740, 751 (1988); *In re Trina-Dee, Inc.*, 26 B.R. 152, 155 (Bankr. E.D. Pa. 1983); *In re Discount Wallpaper Center, Inc.*, 19 B.R. 221, 222 (Bankr. M.D. Fla. 1982). If no reorganization of the Debtors is feasible, then the stay cannot protect any of its property. *See In re Johnston*, 31 B.R. 202, 205 (Bankr. D. Vt. 1983); *In re Martin*, 19 B.R. 496, 498 (Bankr. E.D. Pa. 1982). Above, Textron Financial demonstrated that a reorganization is not feasible.

Moreover, it is well settled that the Property's indispensability to Debtors' survival

and hope of reorganization is, in and of itself, insufficient to justify continuation of the stay. *See In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984). In this regard:

> It is not enough for a debtor to argue that the automatic stay should continue because it needs the secured property in order to propose a reorganization. If this were the test, all property held by debtors could be regarded as necessary for the Debtors' reorganization. The key word under § 362(d)(2)(B) is 'effective'; the property must be necessary to an effective reorganization. If all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that a reorganization in the near future is likely, it cannot be said that the property is necessary to 'effective' reorganization.

*In re Clark Technical Associates, Ltd.*, 9 B.R. 738, 740 (Bankr. D. Conn. 1981); *see also La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283 (Bankr. S.D. Cal. 1982); *In re Winshall*, 758 F.2d 1136 (6th Cir. 1985), *overruled on other grounds, Toibb v. Radloff*, 501 U.S. 157, 111 S. Ct. 2197 (1991).

As shown above, Debtors have no realistic hope whatsoever of confirming a plan of reorganization in this case. Simply put, Debtors cannot propose a feasible and confirmable plan based on the value of the Property, the amount of Textron Financial's claim, and the continuing operating losses being incurred by the Property. Indeed, Debtors' strategy in this case appears to be to place the risk of further loss on Textron Financial, while the Debtors attempt to negotiate some sort of sale or merger or stand alone plan that will result in a side deal for the benefit of Debtors' management and equity holders. Needless to say, this is not an appropriate use of the Bankruptcy Code – and Textron Financial should not be forced to bear the risk of this self-serving folly.

Further, with respect to the Land, it is wholly unnecessary for an effective reorganization. Debtors have shown in the Plan no projections to develop the land and no funds are budgeted under the Plan for such development. Debtors are trying to hold onto the Land while not making any interest or principal payments for 4 years. The Plan sets forth no plans for expansion and no business expectation that Debtors can use that Land in the future. This Land should be released and Textron Financial should be permitted to take the Land.

The bottom line is that: (i) there is no equity in the Property; and (ii) the Property

FENNEMORE CRAIG, P.C.

PHOENIX

is not necessary to an effective reorganization. Accordingly, the Court should grant relief from the automatic stay under Section 362(d)(2).

<b><u>CONCLUSION</u></b>

WHEREFORE, because Debtors have failed to meet their burdens of establishing all the requirements of the Bankruptcy Code necessary for confirmation of the Plan, Textron Financial requests that the Court deny confirmation of the Plan and grant relief from the stay to permit Textron Financial to foreclose on its collateral.

DATED: November 2, 2009

FENNEMORE CRAIG, P.C.

By    /s/ Cathy L. Reece    
     Cathy L. Reece
     Keith L. Hendricks
     Attorneys for Textron Financial Corporation

COPY of the foregoing emailed
this 2nd day of November 2009 to the following:

John J. Hebert
Mark W. Roth
Wesley Ray
Polsinelli Shughart, PC
3636 N. Central Ave.
Suite 1200
Phoenix, AZ 85012
*Attorneys for Debtors*
jhebert@polsinelli.com
mroth@polsinelli.com
wray@polsinelli.com

Larry Watson
Office of US Trustee
230 N. First Ave., Suite 204
Phoenix, AZ 85003-1706
Larry.watson@usdoj.gov

Richard Herold
Heather Macre
Hinshaw & Culbertson LLP
3200 N. Central Ave., Suite 800
Phoenix, AZ 85012-2428
*Attorneys for Irwin Union Bank*
rherold@hinshawlaw.com

///

Edward Zachary
Bryan Cave LLP
Two N. Central Ave., Suite 2200
Phoenix, Arizona 85004-4406
*Attorneys for M&I Bank*
Edward.zachary@bryancave.com

Kelly Singer
Squires Sanders & Dempsey LLP
40 N. Central Ave., Suite 2700
Phoenix, AZ 85004-4498
*Attorneys for Resort Funding LLC*
ksinger@ssd.com

Don Ennis
Snell & Wilmer LLP
400 E. Van Buren
Phoenix, AZ 85004
*Attorneys for Concord Servicing Corp.*
dfennis@swlaw.com

*/s/ Susan Stanczak-Ingram*

2252973.1