John J. Hebert (No. 010633)
Mark W. Roth (No. 01078)
Wesley D. Ray (No. 026351)
**POLSINELLI SHUGHART PC**
Security Title Plaza
3636 North Central Avenue, Ste. 1200
Phoenix, Arizona 85012
Telephone: (602) 650-2000
Email: jhebert@polsinelli.com
Email: mroth@polsinelli.com
Email: wray@polsinelli.com

Attorneys for Debtors.

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| ILX RESORTS INCORPORATED, et al., | Case No. 2:09-bk-03594-RTB |
| Debtors. | Case No. 2:09-bk-03595-RTB |
| | Case No. 2:09-bk-03596-RTB |
| | Case No. 2:09-bk-03598-RTB |
| | Case No. 2:09-bk-03599-RTB |
| | Case No. 2:09-bk-03600-RTB |
| Address: 160 Portal Lane | Case No. 2:09-bk-03601-RTB |
| Sedona, AZ 86336 | Case No. 2:09-bk-03603-RTB |
| | Case No. 2:09-bk-03604-RTB |
| Tax EIN: xx-xxx4171 | Case No. 2:09-bk-03605-RTB |
| | Case No. 2:09-bk-03606-RTB |
| | Case No. 2:09-bk-03608-RTB |
| This filing applies to: | Case No. 2:09-bk-03609-RTB |
| | Case No. 2:09-bk-03610-RTB |
| ☒ ALL DEBTORS | Case No. 2:09-bk-03612-RTB |
| | Case No. 2:09-bk-03617-RTB |
| ☐ SPECIFIED DEBTORS | |
| | Jointly Administered under |
| | Case No. 2:09-bk-03594-RTB |
| | **DEBTORS' MOTION FOR ORDER (A) AUTHORIZING SALE OF ESTATES' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; AND (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES IN CONNECTION WITH SUCH SALE** |

The above-captioned debtors, as debtors and debtors-in-possession (collectively, the "Debtors"), hereby move (the "Motion") the Court for entry of an order pursuant to 11 U.S.C. §§ 105(a), 363, 365, and 1146(a) and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and

9014, for an Order (A) authorizing the sale of the estates' assets free and clear of liens, claims, and interests; and (B) authorizing the assumption and assignment of specified executory contracts and unexpired leases in connection with such sale (the "Sale Motion"). This Sale Motion is made in connection with, and the relief sought herein is contingent upon, confirmation of the Joint Plan of Reorganization by Textron Financial Corporation and Debtors (the "Plan") filed May 17, 2010. In further support of this Sale Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory basis for the relief requested herein 11 U.S.C. §§ 105, 363, 365, and 1146, and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relief Requested

4.      By this Motion, the Debtors seek approval for the proposed sale of substantially all of the assets of the Debtors to ILX Acquisition Inc. (the "Proposed Purchaser"), or to the qualified bidder with the highest or otherwise best bid (the "Successful Bidder"), at an auction (the "Auction") to be conducted at a date to be determined by this Court. The Proposed Purchaser is a third party, not comprised of insiders of the Debtors, with no affiliation to the Debtors.

## The Proposed Asset Purchase Agreement

5.      The Debtors and the Proposed Purchaser have entered into an Asset Purchase Agreement, a copy of which (without its voluminous schedules and exhibits) is attached

hereto as <u>Exhibit A</u> (the "<u>Asset Purchase Agreement</u>") under which, subject to the Auction contemplated hereby and subject to Court approval, the Proposed Purchaser would purchase certain assets of Debtors used in connection with their timeshare marketing, selling, and management business (collectively, the "<u>Acquired Assets</u>") from the Debtors.[1]

6.      Pursuant to the Asset Purchase Agreement, the Proposed Purchaser has offered to purchase the Acquired Assets for $29,672,251 (the "<u>Purchase Price</u>").  The descriptions in this Motion of terms, provisions, conditions, and transactions set forth in the Asset Purchase Agreement are qualified in their entirety by the Asset Purchase Agreement and, in the event of any inconsistency between the discussion of the Asset Purchase Agreement contained in this Sale Motion and in the Asset Purchase Agreement itself, the Asset Purchase Agreement governs.

7.      The Acquired Assets being sold include, without limitation, the following assets:  (a) all of the Debtors' rights under all executory contracts related to the Business and unexpired leases to be assumed and assigned (the "<u>Contracts</u>"), including all Property Management Agreements; (b) all Accounts, including, among other things, all Timeshare Loans; (c) all unsold Timeshare Interests; (d) certain real property and furniture, fixtures, and equipment; (e) all of Debtors' rights as declarant, developer, or seller under the Membership Plan and any other Resort-related, Timeshare Property-related, Club-related, or other Real-Property related document or instrument; and (f) certain general intangibles set forth in the Asset Purchase Agreement.

8.      In addition, the Asset Purchase Agreement expressly provides that certain assets related to the Debtors' business operations will be excluded from the sale (the "<u>Excluded Assets</u>").  The Excluded Assets include, but are not limited to: (a) merchant deposits; (b) income tax refunds; (c) certain real property; (d) certain equipment leases; (e) Timeshare Loans and

---

[1]      Capitalized  terms not otherwise defined herein shall have the meanings ascribed to such terms in

holdbacks owned by Resort Funding, LLC; (f) certain notes receivable claimed as collateral by M&I Bank; (g) all cash and cash equivalents; (h) utility and other deposits made by Debtors; (i) certain documents and corporate and other records; and (j) equity interests of the Debtors and their subsidiaries.

9.     The Asset Purchase Agreement also provides that certain liabilities shall be assumed by the Proposed Purchaser including, without limitation, the following liabilities: (a) approximately $23,800,000 of liabilities owing to Textron Financial Corporation ("Textron") in connection with the Textron Loans; (b) liabilities with respect to loans made by M&I Bank to Sedona Vacation Club and Premier Vacation Club; (c) all obligations of Debtors as declarant, developer, or seller under the Membership Plan and any other Resort-related; Timeshare Property-related or Club-related document or instrument; (d) obligations to honor existing owner and guest reservations, bankings, and allocations of rooms and facilities; (e) unpaid property taxes on the Acquired Assets; (f) liabilities accruing from and after the Closing Date with respect to Contracts assumed or acquired as provided by Section 365 of the Bankruptcy Code; and (g) the lease obligation with Indian Wells Partners for 91 Portal Lane in Sedona, Arizona and payments relating thereto accruing from and after the Closing Date.

10.     In connection with the purchase of the Acquired Assets by the Proposed Purchaser, the Asset Purchase Agreement provides, among other things and without limitation, that the following conditions must occur or be waived prior to closing:     (a) the Proposed Purchaser received title insurance in the face amount of the Purchase Price that insures fee simple title to the real property included in the Acquired Assets, and shall insure use and occupancy rights to the Timeshare Interests that constitute Acquired Assets; (b) this Court shall have entered a final, non-appealable order approving this Sale Motion and the transactions contemplated by the

the Asset Purchase Agreement, and if not defined therein, the Plan.

Asset Purchase Agreement; (c) Debtors' representations and warranties shall be true and correct in all material respects; (d) the Debtors' covenants and agreements shall be performed or complied with in all material respects;;(e) this Court shall have entered an order establishing the Bidding Procedures in a form and in substance acceptable to the Proposed Purchaser; and (f) Purchaser shall have delivered to Debtors the Purchase Price.

11.     In a separate motion, the Debtors sought entry of a proposed order (the "Sales Procedures Order") scheduling a date, time, and place for a hearing on approval of this Sale Motion (the "Sale Hearing") and approving certain bidding procedures.  The proposed Sale Procedures Order also specifies the procedures for objections to the proposed assumption and assignment of the Contracts.  The Debtors have also filed a separate motion which seeks approval of certain notice procedures to be employed in connection with confirmation of the Plan, the Auction, and the sale of the Acquired Assets (the "Notice Motion," and the Order entered relating to same, the "Notice Order").  At the Auction, the Debtors propose to offer the Acquired Assets for sale.  At the conclusion of the Auction, the Debtors propose to identify the highest or otherwise best offer for the Acquired Assets (to the extent such offer is acceptable to Debtors, after consultation with Textron Financial, and the Court, the "Successful Bid" and the bidder making such bid, the "Successful Bidder").  The Successful Bidder will be required to comply with the Court-approved bidding procedures and to commit to proceed to a closing on contractual terms at least as favorable to the Debtors as those set forth in the Asset Purchase Agreement.  At the Sale Hearing, the Debtors shall seek approval of either the Asset Purchase Agreement with the Proposed Purchaser or the asset purchase agreement proposed by the Successful Bidder.

12.     Pursuant to Article V(A) of the Plan the Successful Bid must provide at least the same amount of cash for pre and post confirmation operating expenses, administrative expenses, and priority claims, and the same payment to creditors other than Textron Financial

(including funding the Liquidating Trust), and equity holders (including funding the Stock Pool), that would be made if the Proposed Buyer were the Successful Bidder, and, to the extent that a Successful Bidder other than the Proposed Buyer does not have an agreement with Textron Financial, it must pay Textron Financial's Allowed Secured Claim in full in cash, on the Effective Date, which, as stated in the Plan is $27,681,807 plus interest and fees.

### Propriety of Section 363 Sale
### and Section 365 Assumption and Assignment

13.     Debtors believe that the sale of the Acquired Assets contemplated by this motion is in the best interests of the bankruptcy estates and the Debtors' creditors, and propose such a sale in exercise of sound business judgment and good faith.

14.     The sale of the Acquired Assets will, in connection with confirmation of the Plan, allow for payment of all administrative and priority claims in the Debtors' bankruptcy. Furthermore, the Sale will result in payment in full of substantially all of the Debtors' secured creditors, with the exception of Textron, on the effective date or upon disposition of their collateral.  The Asset Purchase Agreement is the result of extensive negotiations between the Debtors, Textron, and the Proposed Purchaser and the purchase price listed therein is fair and reasonable, especially when considered in light of the current credit market.  Moreover, the Acquired Assets will be subjected to competitive bidding to ensure maximum recovery to the Debtors' estates.

### Marketing Efforts and the Offer by the Proposed Purchaser

15.     The Debtors and Textron have conducted a search for a qualified buyer of the Acquired Assets.  Post-petition, the Debtors engaged the services of Green Street Capital Group to market the Debtors' assets for sale, among other things.

16.     The Debtors, in concert with Textron, re-kindled the search for a potential purchaser in December 2009, as the contested confirmation hearing and hearing on Textron's

motion for automatic stay relief were pending. Those efforts resulted in a written proposal from the Proposed Purchaser. Extensive negotiations with the Proposed Purchaser followed, and ultimately resulted in an agreement for the sale of the Acquired Assets being placed on the record at the hearing of January 7, 2010. The Asset Purchase Agreement constitutes the documentation of that agreement and the best offer received (the "Offer").

17.     The consideration to be paid by the Proposed Purchaser for the Acquired Assets is $29,672,251, which is composed of $5,856,913 in cash and the assumption of the Debtors' obligations under the Textron Loans.

### Bidding Procedures

18.     The Debtors seek approval of the Asset Purchase Agreement with the Proposed Purchaser or such agreements as may be reached with the Successful Bidder. The Debtors shall only seek Court approval of bids that complied, in all respects, with the Court-approved bidding procedures.

### Applicable Authority For Sale Of Assets
### Under Section 363(b) of the Bankruptcy Code

19.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

20.     A sale of substantially all of the Debtors' assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business justification exists for doing so. In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (trustee could sell property under section 363 if it had "articulated business justification"); See also, Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996), citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513,

515 (7th Cir. 1991)); <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143 (3d Cir. 1986); <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 390 (6th Cir. 1986); <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983); <u>In re Titusville Country Club</u>, 128 B.R. 396 (W.D. Pa. 1991); <u>In re Del. & Hudson Railway Co.</u>, 124 B.R. 169, 176 (D. Del. 1991). <u>The Del. & Hudson Railway</u> court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable.

21.     The Debtors have proposed the sale of the Acquired Assets after thorough consideration of all viable alternatives, and have concluded that the sale is supported by sound business reasons.  As noted above, it will allow for payment in full of all administrative and priority claims, and satisfaction of substantially all secured claims, except for those held by Textron Financial.

22.     As discussed in detail above, based upon an analysis of the current economic climate and credit market, the Debtors have concluded that a sale of the Acquired Assets represents a desirable manner in which to maximize value to creditors of the Debtors' Chapter 11 estates while allowing existing customers to continue to enjoy the benefits of the Debtors' resorts.  Preservation of enterprise value for the benefit of all constituencies is a compelling circumstance, and maximization of asset value for the benefit of all creditors is a sound business purpose, warranting authorization of the proposed sale of the Acquired Assets. The proposed sale will allow for the preservation of the value of the Debtors' business and ensure a smooth transition to a new owner.  Thus, there is more than adequate business justification to sell the Acquired Assets to the Proposed Purchaser or to the Successful Bidder.

23.     As a result of the marketing efforts conducted by the Debtors, the Debtors believe that the Offer for the Acquired Assets received by the Proposed Purchaser is fair and reasonable, and provides maximum value to the Debtors' estates.

24.     The Debtors believe that their marketing efforts have yielded in the Asset Purchase Agreement the maximum value for the Acquired Assets.  As further assurance of such value, however, the Offer of the Proposed Purchaser will be tested through a public Auction consistent with the requirements of the Bankruptcy Code and Court-approved bidding procedures. Upon the conclusion of that Auction, the Debtors, the Court, and all parties in interest can be assured that the Acquired Assets will be sold for fair, going-concern, market value. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors from either the Proposed Purchaser or the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an Auction process – the best means for establishing whether a fair and reasonable price is being paid.

25.     Aside from the proposed cash component of the Proposed Purchaser's Offer, the Proposed Purchaser has agreed to assume certain liabilities and contracts of the Debtors.  Such assumed liabilities will relieve the Debtors' estates of substantial claims.

26.     The proposed sale also is the product of arm's-length, good faith negotiations, in which the Debtors bargained for the maximum possible purchase price for the Acquired Assets.  The negotiations involved substantial time and energy by the parties and their professionals, and the Asset Purchase Agreement reflects give-and-take and compromises by both sides.  Under the circumstances, the Debtors submit that the proposed sale is the result of good faith, arm's-length negotiations and that the Proposed Purchaser, or the Successful Bidder, should be entitled to all of the protections of section 363(m) of the Bankruptcy Code, which is further addressed below.

**The Asset Sale Satisfies The Requirements Of Section 363(f) of the**
**Bankruptcy Code For A Sale Free And Clear of Liens, Claims, and Interests**

27.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of

this section free and clear of any interest in such property of an entity other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

28.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Acquired Assets free and clear of all liens, claims, rights, interests, and encumbrances as provided in the Asset Purchase Agreement (collectively, the "Interests"), except with respect to such Interests as are assumed pursuant to the Asset Purchase Agreement, which include those of Textron Financial. See Citicorp Homeowners Services, Inc. v. Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtors submit that each Interest that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request that the Acquired Assets be transferred to the Proposed Purchaser (under the express terms of the Asset Purchase Agreement), or to the Successful Bidder, free and clear of all Interests, except, as to the Proposed Purchaser, the Textron Financial Loans, and the other Interests that are assumed liabilities under the Asset Purchase Agreement, with such Interests to attach to the proceeds of the sale.

## The Sale of Assets Is Free of Any Successor Liability To Proposed Purchaser

29.     The Proposed Purchaser or the Successful Bidder should not be liable for any of the Debtors' liabilities (other than assumed liabilities), as a successor to the Debtors' business or otherwise (the "Excluded Liabilities").  Extensive case law exists providing that claims against debtors are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

30.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests."  The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor, JV, 209 F.3d 252, 259 (3d Cir. 2000).  In Folger Adam, the Third Circuit specifically addressed the scope of the term "any interest."  209 F.3d at 258.  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property."  Id. at 258, citing 3 Collier on Bankruptcy ¶ 363.06[1].  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger Adam, the scope of 11 U.S.C. § 363(f) is not limited to in rem interests.  Thus, the Third Circuit in Folger Adam stated that Leckie held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute."  Folger Adam, 209 F.3d at 258.

31.     Courts have consistently held that a proposed purchaser of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims.  See Ninth Avenue Remedial Group, 195 B.R. 716l, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be

brought against the bankruptcy estate during the bankruptcy); <u>In re Johns-Manville Corp.</u>, 837

F.2d 89 (2d Cir.), <u>cert denied</u>, 488 U.S. 868 (1988) (channeling of claims to proceeds consistent

with intent of sale free and clear under section 363(f) of the Bankruptcy Code); <u>In re New

England Fish Co.</u>, 19 B.R. 323 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear

sale included free and clear of Title VII employment discrimination and civil rights claims of

debtor's employees); <u>In re Hoffman</u>, 53 B.R. 874 (Bankr. D.R.I. 1985), <u>aff'd</u>, 65 B.R. 985 (D.R.I.

1986) (transfer of liquor license free and clear of any interest permissible even though the estate

had unpaid taxes); <u>In re All Am. Of Ashburn, Inc.</u>, 56 B.R. 186 (Bankr. N.D. Ga.), <u>appeal decided

by</u> 805 F.2d 1515 (11th Cir. 1986) (product liability claims precluded on successor doctrine in a

sale of assets free and clear); <u>In re WBQ Partnership</u>, 189 B.R. 97 (Bankr. E.D. Va. 1995) (State's

right to recapture depreciation is an interest as used in section 363(f) of the Bankruptcy Code).

32.     For obvious reasons, the very purpose of an order purporting to authorize

the transfer of assets free and clear of all "interests" would be frustrated if claimants could

thereafter use the transfer as a basis to assert claims against the proposed purchaser arising from

the debtor's pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the Proposed

Purchaser or the Successful Bidder(s) are entitled to know that the Acquired Assets are not

infected with latent claims that will be asserted against the Proposed Purchaser or the Successful

Bidder(s) after the proposed transaction is completed.

33.     Existing case law authorizes the issuance of injunctions under these

circumstances:

> Courts have long recognized that inherent within the authority to
> sell property free and clear of liens is the power to enjoin such
> creditors from pursuing the purchase of such property.
> Nevertheless, more explicit protection is often needed to effectuate
> this important aspect of a § 363 sale.  In other words, an actual
> injunction barring creditors from suing a proposed purchaser of
> estate assets is sometimes necessary and appropriate to give the

"free and clear" aspect of § 363(f) meaning. When this is the case, a court has the power to "issue an [] order . . . necessary or appropriate to carry out [§ 363(f), one of] the provisions of the [Bankruptcy Code].

In re Dow Corning Corp., 198 B.R. 214, 245 (Bankr. E.D. Mich. 1996), citing, inter alia, 11 U.S.C. § 105(a); Whitehead & Kales Co. v. Dempster (In re Wiltse Bros. Corp.), 361 F.2d 295, 299 (6th Cir. 1966). Also, while the bankruptcy courts generally recognize that:

> § 105(a) neither creates substantive rights nor permits the courts to contravene the Bankruptcy Code," it is equally clear that under certain circumstances "a permanent injunction is necessary to 'carry out' the effect of the 'free-and-clear' language [contained in a § 363 sale order].

W.B.Q. Partnership, 189 B.R. at 110. See also In re P.K.R. Convalescent Centers, 189 B.R. 90 (Bankr. E.D. Va. 1995)(the bankruptcy court enjoined a creditor from suing the proposed purchaser prior to the approval of the sale); In re Paris Industries Corp., 132 B.R. 504 (D. Me. 1991) (enjoining creditors from filing suit against proposed purchaser where claim against predecessor in bankruptcy court was possible); In re Parks Indus. Corp., 132 B.R. 504 (D. Me. 1991) (free and clear sale enabled bankruptcy court to enjoin product liability claims as asserted against proposed purchaser).

34.     In this matter, the Proposed Purchaser and the Successful Bidder(s) are understandably unwilling to purchase assets from the Debtors, supposedly free and clear of claims, liens, rights, interests and encumbrances, only to be forced to repeatedly re-litigate the issue with the individual claimants after the sale is completed. Accordingly, any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims and any competing allegations should be resolved in the context of this Chapter 11 case.

### Authorization Of Assumption And Assignment Of Contracts

35.     As required by the Asset Purchase Agreement, the Debtors request approval, under 11 U.S.C. § 365, of the assumption and assignment of the Contracts to the Proposed Purchaser or, alternatively, to the Successful Bidder.[2]  The Debtors further request that the order approving such sale provide that the Contracts will be transferred to, and remain in full force and effect for the benefit of, the Proposed Purchaser (or other Successful Bidder) notwithstanding any provisions in the Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment. The Contracts will be identified in a schedule to the Asset Purchase Agreement that will be provided at or before the closing of the sale.

36.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee

---

[2]  Debtors and the Proposed Purchaser are still in the process of determining which of the multitude of Contracts shall be assumed and assigned.  Upon such determination, notice will be provided or supplemented with respect to the counterparties to such Contracts, as required by the Notice Order.

1    will promptly cure, such default;

2         (B) compensates, or provides adequate assurance that the
3    trustee will promptly compensate, a party other than the debtor to
     such contract or lease, for any actual pecuniary loss to such party
4    resulting from such default; and

5         (C) provides adequate assurance of future performance
     under such contract or lease.

6    11 U.S.C. § 365(b)(1).

7         37.    Although section 365 of the Bankruptcy Code does not set forth standards

8    for courts to apply in determining whether to approve a debtor in possession's decision to assume

9    an executory contract, courts have consistently applied a "business judgment" test when

10   reviewing such a decision.  See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St.

11   Paul & Pacific Railroad Co., 318 U.S. 523, 550 (1953); Matter of Talco, Inc., 558 F.2d 1369,

12   1173 (10th Cir. 1977).  A debtor satisfies the "business judgment" test when it determines, in

13   good faith, that assumption of an executory contract will benefit the estate and the unsecured

14   creditors.  In re FCX, Inc., 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986).  The assumption and

15   assignment of the Contracts set forth in the Asset Purchase Agreement is a necessary part of the

16   deal that the Debtors have struck with the Proposed Purchaser.

17
18        38.    The meaning of "adequate assurance of future performance" depends on

19   the facts and circumstances of each case, but should be given "practical, pragmatic construction."

20   See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

21   1989).  See also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

22   assurance of future performance does not mean an absolute assurance that debtor will thrive and

23
24   pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  The

25   Proposed Purchaser and all Qualified Bidders will be providing one or more commitment letters

26   to the Debtors showing they are sufficiently capitalized to perform their obligations under the

27   Asset Purchase Agreement and under the Contracts, and they will provide evidence to that effect

28

at the Sale Hearing. Consequently, assumption and assignment of the Contracts is appropriate under the circumstances.

**Relief From Transfer Taxes Under Section 1146(a) of the Bankruptcy Code**

39. Section 1146(a) of the Bankruptcy Code provides that "the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." This language has been construed to even include transfers pursuant to a sale outside of, but in furtherance of, effectuating a plan. In re Jacoby-Bender, Inc., 758 F.2d 840, 842 (2d Cir. 1985) (holding that section 1146(a) of the Bankruptcy Code applies when the "transfer is necessary to the consummation of a plan"); City of New York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985) (holding that 1146(c) applied when "the transfer of the property was essential to the confirmation of the plan")

40. The sale of the Acquired Assets, the approval of which is sought herein, and confirmation of the Plan are conditioned upon one another. The confirmation of the Plan will be contemporaneous with the entry of an order approving the transactions contemplated in the Asset Purchase Agreement. As such, the consummation of the sale of the Acquired Assets is a prerequisite to plan confirmation and, accordingly, should be exempt from stamp tax or similar taxes under section 1146(c) of the Bankruptcy Code. All relevant taxing authorities will receive notice of this Sale Motion.

**Good Faith Under Section 363(m) of the Bankruptcy Code**

41. Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith", the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a Proposed Purchaser act in good faith. speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a Proposed Purchaser's good faith status at a judicial sale involves fraud, collusion between the Proposed Purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).  The sale to be effected by the Asset Purchase Agreement is an intensely-negotiated, arm's-length transaction, in which the Proposed Purchaser has, at all times, acted in good faith under the Abbotts Dairy standards.  The Debtors thus request that the Court make a finding that the Proposed Purchaser (or the Successful Bidder) has purchased the Acquired Assets, and has taken by assignment the Contracts, in good faith within the meaning of section 363(m) of the Bankruptcy Code.

### The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances

42.     As noted above, the Debtors have, by separate motion, sought the Court's approval of the notice procedures to be employed in connection with confirmation of the Plan and the sale of the Acquired Assets.  The noticing regime set forth therein provides adequate notice to parties-in-interest of the sale of the Acquired Assets, and all hearings to be held and procedures to be followed in connection therewith.

43.     The Debtors submit that the notice they intend to provide both of the proposed sale and of this Sale Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

<u>**Conclusion**</u>

44.     The Debtors' proposed sale of the Acquired Assets as described in this Sale Motion and the assumption and assignment of the Contracts is proper, necessary and serves the best interests of the Debtors, their estates, employees, members, and creditors.   The relief requested in this Sale Motion will maximize recoveries for all creditors of the estates.   The Debtors thus move the Court to approve the sale as requested.

WHEREFORE, the Debtors respectfully request that the Court enter an order in substantially the form attached hereto:  (i) granting the Sale Motion; (ii) approving the sale of the Acquired Assets to the Proposed Purchaser or the Successful Bidder (iii) approving the form and manner of notice thereof; and (iv) granting such other and further relief as is just and proper.

DATED:  June 14, 2010

POLSINELLI SHUGHART PC


By:  */s/ Wesley D. Ray*
    John J. Hebert
    Mark W. Roth
    Wesley D. Ray
    Security Title Plaza
    3636 North Central Avenue, Ste. 1200
    Phoenix, Arizona 85012

    *Attorneys for the Debtors*

**COPY** of the foregoing served via U. S. First Class mail, or served via electronic notification if indicated by an "*" on June 14, 2010, to:

Larry W. Watson
U.S. TRUSTEE'S OFFICE
230 North 1st Avenue, Suite 204
Phoenix, AZ  85003

Cathy L. Reece * creece@fclaw.com
FENNEMORE CRAIG, P.C.
3003 N. Central Ave., Suite 2600
Phoenix, AZ  85012
*Attorneys for TEXTRON FINANCIAL CORPORATION*

| | |
|---|---|
| James Kneller * jim@jimknellerlaw.com | Scott B. Cohen * sbc@engelmanberger.com |
| LAW OFFICES OF JAMES KNELLER, PC | ENGELMAN BERGER P.C. |
| 6750 East Camelback Road, Suite 101 | 3636 N. Central Avenue |
| Scottsdale, AZ 85251 | Security Title Plaza, Suite 700 |
| *Attorneys for TUCSON ELECTRIC POWER* | Phoenix, AZ 85012-1936 |
| *COMPANY and ARIZONA PUBLIC SERVICE* | *Attorneys for ARIZONA BANK & TRUST* |
| | |
| Richard H. Herold, Jr. * rherold@hinshawlaw.com | Kelly Singer * ksinger@ssd.com |
| HINSHAW & CULBERTSON LLP | Bradley A. Cosman * bcosman@ssd.com |
| 3200 N. Central Ave., Suite 800 | SQUIRE SANDERS & DEMPSEY LLP |
| Phoenix, AZ 85012-2428 | Two Renaissance Square |
| *Attorneys for First Financial Bank, N.A.,* | 40 N. Central Ave., Suite 2700 |
| *Hamilton Ohio, Successor-in-Interest to the* | Phoenix, AZ 85004-4498 |
| *Federal Deposit Insurance Corporation,* | *ATTORNEYS FOR RESORT FUNDING, LLC* |
| *Receiver of IRWIN UNION BANK, FSB* | |
| | |
| Don C. Fletcher * dfletcher@lakeandcobb.com | Donald F. Ennis*  dfennis@swlaw.com |
| LAKE & COBB, P.L.C. | SNELL & WILMER, L.L.P. |
| 1095 W. Rio Salado Pkwy., Suite 206 | 400 E. Van Buren |
| Tempe, Arizona 85281 | Phoenix, AZ  85004 |
| *Attorneys for HUGH E. GREEN AND* | *Attorneys for CONCORD SERVICING* |
| *LINDA G. SILFVEN* | *CORPORATION* |
| | |
| Frank F. McGinn* ffm@bostonbusinesslaw.com | Paul M. Weiser * pweiser@buchalter.com |
| BARTLETT HACKETT FEINBERG P.C. | BUCHALTER NEMER |
| 155 Federal Street, 9th Floor | 16435 N. Scottsdale Road, Suite 440 |
| Boston, MA  02110 | Scottsdale, AZ 85254-1754 |
| *Attorneys for IRON MOUNTAIN* | *Attorneys for TEACHERS INSURANCE* |
| *INFORMATION MANAGEMENT, INC.* | *AND ANNUITY ASSOCIATION OF AMERICA* |
| | |
| Larry K. Udall * ludall@cgsuslaw.com | Thomas G. Luikens * thomas.luikens@azbar.org |
| CURTIS GOODWIN SULLIVAN | AYERS & BROWN, P.C. |
| UDALL & SCHWAB, PLC | 4227 N. 32nd Street, First Floor |
| 501 E. Thomas Road | Phoenix, AZ 85018 |
| Phoenix, AZ  85012-3205 | *Interested Party and Attorneys for* |
| *Attorneys for NAVOPACHE ELECTRIC COOP.* | *ROUNDHOUSE RESORT VACATION PLAN OWNERS* |
| | *ASSOCIATION* |
| | |
| William Novotny * william.novotny@mwmf.com | Terry A. Dake * tdake@cox.net |
| MARISCAL, WEEKS, MCINTYRE & | TERRY A. DAKE, LTD. |
| FRIEDLANDER, P.A. | 11811 N. Tatum Boulevard, Suite 3031 |
| 2901 North Central Avenue, Suite 200 | Phoenix, AZ  85028-1621 |
| Phoenix, AZ  85012-5000 | *Attorneys for DALE D. ULRICH, CHAPTER 7* |
| *Attorneys for CANYON PORTAL II, L.L.C., AND* | *TRUSTEE OF BANKRUPTCY ESTATE OF* |
| *SINAGUA PLAZA II, L.L.C.* | *CRAIG R. ROETMAN* |
| | |
| Robert J. Miller * rjmiller@bryancave.com | Terri A. Roberts * pcaocvbk@pcao.pima.gov |
| Edward M. Zachary * | German Yusufov * pcaocvbk@pcao.pima.gov |
| edward.zachary@bryancave.com | Deputy County Attorneys, Civil Division |
| Justin A. Sabin * justin.sabin@bryancave.com | PIMA COUNTY ATTORNEY'S OFFICE |
| BRYAN CAVE, LLP | 32 North Stone Avenue, Suite 2100 |
| Two N. Central Avenue, Suite 2200 | Tucson, AZ  85701 |
| Phoenix, AZ 85004-4406 | *Attorneys for PIMA COUNTY* |
| *Attorneys for M&I MARSHALL & ILSLEY BANK* | |

| | |
|---|---|
| 1 | Jack Barker * jpb@bhhhlaw.com |
| 2 | BARKER HIGGINS HITCHCOCK & HESSE, PLLC |
| | 1630 East White Mountain Boulevard, Suite B |
| 3 | Pinetop, AZ 85935 |
| | *Attorneys for PONDEROSA DOMESTIC WATER* |
| 4 | *IMPROVEMENT DISTRICT* |

1    Jack Barker * jpb@bhhhlaw.com              Barbara L. Caldwell * blc@ashrlaw.com
2    BARKER HIGGINS HITCHCOCK & HESSE, PLLC     AIKEN SCHENK HAWKINS & RICCIARDI P.C.
     1630 East White Mountain Boulevard, Suite B    4742 North 24th Street, Suite 100
3    Pinetop, AZ  85935                         Phoenix, AZ  85016-4859
     *Attorneys for PONDEROSA DOMESTIC WATER*   *Attorneys for MARICOPA COUNTY*
     *IMPROVEMENT DISTRICT*
4
     Andrew Abraham *  aabraham@bcattorneys.com    Sarah Moyed
5    BURCH & CRACCHIOLO, P.A.                   U.S. SECURITIES AND
     P. O. Box 16882                                EXCHANGE COMMISSION
6    Phoenix, AZ 85011-6882                     5670 Wilshire Blvd., Suite 1100
     *Attorneys for THE STEELE FOUNDATION, INC.*    Los Angeles, CA 90036-5679
7
     Gilbert L. Hamberg
8    1038 Darby Drive
     Yardley, Pennsylvania 19067-4519
9    *Attorneys for TUCSON ELECTRIC POWER*
     *COMPANY AND UNS GAS, INC.*
10

11
     By:  /s/ Diane Ashworth
12

Case 2:09-bk-03594-RTBP    Doc 453    Filed 06/14/10    Entered 06/14/10 12:56:39    Desc
                           Main Document    Page 20 of 62

Jack Barker * jpb@bhhhlaw.com
BARKER HIGGINS HITCHCOCK & HESSE, PLLC
1630 East White Mountain Boulevard, Suite B
Pinetop, AZ  85935
*Attorneys for PONDEROSA DOMESTIC WATER IMPROVEMENT DISTRICT*

Barbara L. Caldwell * blc@ashrlaw.com
AIKEN SCHENK HAWKINS & RICCIARDI P.C.
4742 North 24th Street, Suite 100
Phoenix, AZ  85016-4859
*Attorneys for MARICOPA COUNTY*

Andrew Abraham *  aabraham@bcattorneys.com
BURCH & CRACCHIOLO, P.A.
P. O. Box 16882
Phoenix, AZ 85011-6882
*Attorneys for THE STEELE FOUNDATION, INC.*

Sarah Moyed
U.S. SECURITIES AND
    EXCHANGE COMMISSION
5670 Wilshire Blvd., Suite 1100
Los Angeles, CA 90036-5679

Gilbert L. Hamberg
1038 Darby Drive
Yardley, Pennsylvania 19067-4519
*Attorneys for TUCSON ELECTRIC POWER COMPANY AND UNS GAS, INC.*

By:  /s/ Diane Ashworth

# EXHIBIT A

ASSET PURCHASE AGREEMENT

BETWEEN

ILX RESORTS INCORPORATED, ILE SEDONA INCORPORATED, ILX TOURIST STATION INCORPORATED, ILX-BRUNO LLC, LOS ABRIGADOS PARTNERS LIMITED PARTNERSHIP, GENESIS INVESTMENT GROUP INC., PUERTO PEÑASCO VACATION DESTINATIONS, S. DE R.L. DE CV., PREMIERE DEVELOPMENT INCORPORATED, SEA OF CORTEZ PREMIERE VACATION CLUB S. DE R.L. DE C.V., ROCKY POINT GENESIS INCORPORATED, VCA TUCSON INCORPORATED, VCA SOUTH BEND INCORPORATED, VCASB PARTNERS GENERAL PARTNERSHIP, FIRST PIGGY LLC, HARBOR SOUTHWEST DEVELOPMENT, INC., ILX BELL ROCK INCORPORATED,

AND

ILX ACQUISITION, INC.

Dated as of _____, 2010

# *EXHIBIT A*

## TABLE OF CONTENTS

ARTICLE 1. DEFINITIONS.................................................................................1

ARTICLE 2. PURCHASE AND SALE OF ACQUIRED ASSETS.............................12

ARTICLE 3. REPRESENTATIONS AND WARRANTIES OF SELLERS................17

ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF PURCHASER..........19

ARTICLE 5. COVENANTS AND OTHER AGREEMENTS....................................19

ARTICLE 6. CONDITIONS TO CLOSING; CLOSING DELIVERIES....................22

ARTICLE 7. TERMINATION.............................................................................27

ARTICLE 8. SURVIVAL AND REMEDIES..........................................................27

ARTICLE 9. BANKRUPTCY COURT APPROVAL; SALE SUBJECT TO
      HIGHER AND BETTER OFFERS; OTHER........................................28

ARTICLE 10. MISCELLANEOUS .....................................................................31

LIST OF EXHIBITS
LIST OF SCHEDULES

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of _____, 2010 (the "Effective Date"), by and between ILX Resorts Incorporated, ILE Sedona Incorporated, ILX Tourist Station Incorporated, ILX-Bruno LLC, Los Abrigados Partners Limited Partnership, Genesis Investment Group, Inc., Puerto Peñasco Vacation Destinations, S. de R.L. de C.V., Premiere Development Incorporated, Sea of Cortez Premiere Vacation Club S. de R.L. de C.V., Rocky Point Genesis Incorporated, VCA Tucson Incorporated, VCA South Bend Incorporated, VCASB Partners General Partnership, First Piggy LLC, Harbor Southwest Development, Inc., ILX Bell Rock Incorporated (collectively referred to herein as "Sellers" and each individually as a "Seller") and ILX Acquisition, Inc., a corporation organized under the laws of Delaware ("Purchaser"). Sellers and Purchaser may be referred to herein as "Parties" or each a "Party."

## RECITALS

1.    Sellers are engaged in the business of owning, developing, marketing and operating timeshare resorts in the United States and Mexico (the "Business").

2.    On March 2, 2009, the Sellers filed petitions (the "Bankruptcy Case") under the Bankruptcy Code. The cases are pending in the United States Bankruptcy Court for the District of Arizona, and are being jointly administered under Case Number 2:09-bk-03594-RTB.

3.    Sellers desire to sell certain assets and assign certain liabilities relating to the Business to Purchaser, and Purchaser desires to purchase such assets and assume such liabilities on the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants, conditions, and agreements hereinafter set forth, and the above recitals which are incorporated into this Agreement by this reference, the Parties agree as follows.

## ARTICLE 1.
## DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth or referenced below.

"Accounts" means all "accounts" (as defined in the UCC) owned by any Seller and all of the following owned by any Seller: (a) accounts receivable, contract rights, book debts, notes, drafts and other obligations or indebtedness owing to any Seller arising from the sale, lease or exchange of goods or other property and/or the performance of services and arising from the Membership Plan and the Property Management Agreements; (b) any Seller's rights in, to and under all purchase orders for goods, services or other property; (c) any Seller's rights to any goods, services or other property represented by any of the foregoing (including returned or repossessed goods and unpaid sellers' rights of rescission, replevin, reclamation and rights to stoppage in transit); (d) monies due to or to become due to any Seller under all contracts for the sale, lease or exchange of goods or other property and/or the performance of services including

# *EXHIBIT A*

the right to payment of any interest or finance charges with respect thereto (whether or not yet earned by performance on the part of any Seller); (e) any Seller's rights to payment from any consumer credit/charge card issuer or any entity which sponsors or administers such cards as the American Express Card, Visa Card, MasterCard, Diners Club Card or Discover Card; (f) all collateral security and guaranties of any kind given by any Person with respect to any of the foregoing; and (g) all Rents (as defined herein).

"Acquired Assets" is defined in Section 2.1.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, alone or through one or more intermediaries, controls, is controlled by, or is under common control with that Person. For purposes of this definition, "control" (including the terms "controlling" and "controlled") means the power to direct or cause the direction of the management and policies of a Person, directly or indirectly, whether through the ownership of securities or partnership or other ownership interests, by contract, or otherwise.

"Allocation Schedule" is defined in Section 2.8.

"Agreement" means this Asset Purchase Agreement and all Exhibits and Schedules hereto, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

"Assumed Liabilities" is defined in Section 2.3.

"Auction" is defined in Section 9.3(e).

"Bankruptcy Case" is defined in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Arizona or any other court having jurisdiction over the Bankruptcy Case from time to time.

"Bidding Procedures" is defined in Section 9.3.

"Break-Up Fee" is defined in Section 9.4.

"Business" is defined in the Recitals.

"Business Day" means any day, other than a Saturday or Sunday, on which commercial banks and foreign exchange markets are open for business in Phoenix, Arizona.

"Closing" is defined in Section 2.6.

"Closing Date" is the date on which the Closing occurs.

"Closing Period" means the time period between the Effective Date and the Closing Date.

2680546.2
Case 2:09-bk-03594-RTBP    Doc 453    Filed 06/14/10    Entered 06/14/10 12:56:39    Desc
Main Document       Page 24 of 62

# *EXHIBIT A*

"Club" means, as the context may provide, that certain multi-located vacation ownership membership program known as the "Premiere Vacation Club" formed by Premiere Development Incorporated, an Arizona corporation, in accordance with the Membership Plan, and/or the not-for-profit Arizona corporation named "Premiere Vacation Club".

"Commitment" means a current commitment for Title Insurance or Preliminary Title Insurance issued by Title Company setting forth the state of title to the unsold Timeshare Property, the Real Property and the unsold Timeshare Interests, together with all exceptions or conditions to such title and all other encumbrances affecting such property.

"Confidential Information" means any and all information regarding the Business, finances, operations, products, services, and customers of the Sellers and their Affiliates, specified in written or oral form or in any other medium.

"Consent" means all consents and approvals of Governmental Authorities or other third parties necessary to authorize, approve, or permit the Parties hereto to consummate the Transactions.

"Contracts" means (a) all contracts, agreements, assignable permits and licenses (including occupancy permits, business licenses, and liquor licenses) warranties, and representations to which any Seller is a party relating to or governing the use, occupancy, operation, management, repair, or service of the Business; (b) all agreements with credit card issuers, sponsors or administrators; (c) to the extent any Seller is a party thereto, all leases, occupancy agreements, registration and concession agreements, and commitments to provide rooms or facilities in the future to the extent that they are not solely interests in real estate; and (d) Property Management Agreements and any contracts and agreements described in the Membership Plan to which any Seller is a party. "Contracts" includes all amendments, modifications, and supplements to any of the foregoing.

"Copyright License" means any oral or written agreement now in existence, as may be amended, supplemented or otherwise modified from time to time, by which: (a) any Seller is granted any right to use one or more Copyrights; or (b) any Seller grants the right to use one or more of any Seller's Copyrights to another party.

"Copyrights" means collectively all of the following now owned by or on behalf of any Seller: (a) all copyrights (whether or not registered with the U.S. Copyright Office), rights and interests in copyrights, works protectable by copyright, copyright registrations and copyright applications (including, but not limited to those listed on Schedule 1(a)); (b) all renewals of any of the foregoing; (c) all income, royalties, damages and payments now or hereafter due and/or payable under any of the foregoing or with respect to any of the foregoing, including, without limitation, damages and payments for past, present and future infringements of any of the foregoing; (d) the right to sue for past, present and future infringements of any of the foregoing; (e) all rights corresponding to any of the foregoing throughout the world; and (f) all goodwill associated with any of the foregoing.

"Cut-Off Date" means three (3) Business Days prior to the Closing Date.

"Declarants' Rights" is defined in Section 2.1(e).

3

# EXHIBIT A

"Deposit" is defined in Section 9.3(c)(ii).

"Designated Bid" is defined in Section 9.3(e).

"Documents" means all "documents" (as defined in the UCC) or other receipts covering, evidencing or representing goods now owned by any Seller including, without limitation, all bills of lading, dock warrants, dock receipts, warehouse receipts and orders for the delivery of goods, and any other document which in the regular course of business or financing is treated as adequately evidencing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers.

"Earnest Money Deposit" is defined in Section 2.5.

"Effective Date" is defined in the introductory paragraph.

"Equipment" means all "equipment" (as defined in the UCC) now owned by any Seller including, without limitation, all machinery, Vehicles, FF&E, irrigation and landscaping equipment, golf carts and all other tangible personal property (other than Inventory) and all parts thereof and all additions and accessions thereto and replacements therefor including equipment owned by any Seller and related to the operation and management of the Club.

"Excluded Assets" is defined in Section 2.2.

"FF&E" means furnishings, Fixtures and Equipment.

"Fixtures" means all "fixtures" (as defined in the UCC) now owned by any Seller including, without limitation, plant fixtures, trade fixtures and business fixtures, wherever located, and all additions and accessions thereto and replacements therefor including fixtures owned by any Seller and related to the operation and management of the Club.

"General Intangibles" means all "general intangibles" (as defined in the UCC) owned by or on behalf of any Seller including, without limitation: (a) all Contracts; (b) all obligations or indebtedness owing to any Seller (other than Accounts provided that General Intangibles shall include any of the property specifically described in the definition of Accounts which constitutes general intangibles under applicable law) or other rights to receive payments of money from whatever source arising and all collateral security therefor and arising from the Membership Plan; (c) all Intellectual Property, software licenses, and all receivables (including, but not limited to royalty income, damages awards and other payments) deriving from the Intellectual Property; (d) all Internet domain names (including all rights and interests in such domain names, domain registrations and reservations therefore) and all Internet websites as described in Schedule 1(b); (e) all telephone numbers; (f) all payment intangibles; (g) all letter of credit rights; and (h) all trade secrets and other Confidential Information relating to the business of any Seller including, without limitation: the names and addresses of, and credit and other business information concerning, any Seller's past, present, or future customers; the prices which any Seller obtains for its services or at which it sells its merchandise; policies and procedures pertaining to the marketing, sale, and design of goods and services furnished by any Seller; information concerning any Seller's suppliers and distributors; and information concerning the manner of operation, business plans, projections, methods, and all other information of any kind

4

or character, whether or not reduced to writing, with respect to the conduct by any Seller of its business not generally known by the public and protected by any Seller as a trade secret.

"<u>Governmental Authority</u>" means a Federal, state, or local court, legislature, governmental agency (including the United States Department of Justice), commission, or regulatory or administrative authority or instrumentality.

"<u>Homeowner Associations</u>" means all homeowner associations relating to the Acquired Assets, including, inter alia, Sedona Vacation Club Incorporated, Premiere Vacation Club, The Inn at Los Abrigados Owners Association, Varsity Clubs of America – Tucson Chapter, Varsity Clubs of America – South Bend Chapter, Kohl's Ranch Owners Association, Golden Eagle Resort Condominium Association, Inc., and ILX Bell Rock Incorporated.

"<u>In-Transit Loan</u>" means a Timeshare Loan (a) for which the applicable Timeshare Interest sale from which it arises has not been canceled by the applicable mortgagor or the Originator; (b) for which the Timeshare Interest purchased by the applicable mortgagor has not been surrendered in accordance with the terms of the relevant Purchase Contract; (c) for which the related Timeshare Interest sale fully complies with the terms, provisions, and conditions of this Agreement and all applicable law, including Timeshare Laws; (d) for which no scheduled monthly payment to be made by the related mortgagor thereunder is thirty (30) days or more past due; (e) for which the related Timeshare Loan Files are, to the Seller's best knowledge, materially complete and (f) is under the ownership and control of the applicable Seller.

"<u>Instruments</u>" means all "instruments", "chattel paper" (including electronic chattel paper) and "letters of credit", in which any Seller has any rights (each as defined in the UCC) including, without limitation, all checks, drafts, notes, bonds, debentures and certificates of deposit.

"<u>Intellectual Property</u>" means, collectively, all of the following: Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses.

"<u>Inventory</u>" means all "inventory" (as defined in the UCC) now owned by any Seller, wherever located, including, without limitation, finished goods, including embedded software, raw materials, work in process and other materials and supplies (including packaging and shipping materials) used or consumed in the manufacture or production thereof including inventory owned by any Seller and used or consumed in connection with the operation and management of the Club and goods which are returned to or repossessed by any Seller, and all snack bar, bar and restaurant inventory.

"<u>Law</u>" means applicable common law and any statute, ordinance, code, or other law, rule, permit, permit condition, regulation, order, decree, technical or other standard, requirement, or procedure enacted, adopted, promulgated, applied, or followed by any Governmental Authority, including, inter alia, all Timeshare Laws.

"<u>Licenses</u>" is defined in Section 3.5.

# EXHIBIT A

"<u>Lien</u>" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, right of first refusal or right of others therein, or encumbrance of any nature whatsoever in respect of such asset.

"<u>Membership Plan</u>" means that certain Membership Plan (Restated) of the Club dated as of February 14, 2008, as amended. For purposes of this Agreement, Membership Plan also means, with respect to a Timeshare Interest, collectively: the related Purchase Contract and the various other documents and instruments that among other things (a) in consideration of the payment of a purchase price, including the payment of any Obligor Note, if any, grants the Obligor the license or right to use and occupy one or more units in one or more Resorts pursuant to the Membership Plan, (b) imposes certain obligations on the Obligor regarding payment of the Obligor Note, if any, the Obligor's use or occupancy of one or more units in one or more Resorts, and the payment of a maintenance fee, as such obligations are described in the Membership Plan and (c) grants the holder thereof certain rights, including the rights to payment of the related Obligor Note, if any, and to terminate the Membership Plan or revoke the Obligor's rights under it, and thereafter to resell the Timeshare Interest to another Person.

"<u>Mortgage</u>" means, with respect to each Mortgage Loan, the mortgage, deed of trust or other instrument creating a first lien on a Timeshare Property securing such Timeshare Loan.

"<u>Mortgage Loan</u>" means a Timeshare Loan that is secured by a Mortgage on a Timeshare Property. The term "Mortgage Loan" shall include the related Obligor Note, Mortgage and other security documents contained in the related Timeshare Loan File.

"<u>Obligor</u>" means a Person obligated to make payments under a Timeshare Loan.

"<u>Obligor Note</u>" means the executed promissory note or other instrument of indebtedness evidencing the indebtedness of an Obligor under a Timeshare Loan, together with any rider, addendum or amendment thereto, or any renewal, substitution or replacement of such note or instrument.

"<u>Originator</u>" means any Seller or any other Person that entered into a Purchase Contract with an Obligor to finance the purchase of a Timeshare Interest.

"<u>Party</u>" or "<u>Parties</u>" is defined in the introductory paragraph.

"<u>Patent License</u>" means any oral or written agreement now in existence, as may be amended, supplemented or otherwise modified from time to time, by which: (a) any Seller is granted any right to use any invention on which a patent is in existence; or (b) any Seller grants the right to use any invention on which a patent is in existence.

"<u>Patents</u>" means collectively all of the following now owned by or on behalf of any Seller: (a) all patents and patent applications (including, without limitation, those listed on <u>Schedule 1(c)</u>) and the inventions and improvements described and claimed therein, and all patentable inventions (whether or not they are registered with the United States Patent Office); (b) the reissues, divisions, continuations, renewals, extensions and continuations-in-part of any of the foregoing; (c) all income, royalties, damages and payments now or hereafter due and/or payable under any of the foregoing or with respect to any of the foregoing, including, without

6

limitation, damages and payments for past, present and future infringements of any of the foregoing; (d) the right to sue for past, present and future infringements of any of the foregoing; (e) all rights corresponding to any of the foregoing throughout the world; and (f) all goodwill associated with any of the foregoing.

"Permitted Exceptions" means the Permitted Liens and those exceptions or conditions that affect title to the Acquired Assets, but which are acceptable to Purchaser, pursuant to Section 2.7(b) below.

"Permitted Liens" means only those certain Liens related to the Textron Loans.

"Person" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, Governmental Authority, cooperative, association, individual, or other entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such person as the context may require.

"Procedures Hearing" is defined in Section 9.1.

"Procedures Order" is defined in Section 9.1.

"Property Management Agreement" means each management agreement entered into by and between a Seller and a Homeowner Association, pursuant to which the property manager is to provide management and other services with respect to the Club and Resorts as contemplated by the Membership Plan or any other applicable ownership or membership plan.

"Purchase Contract" means any purchase contract for a Timeshare Interest executed and delivered by an Obligor and pursuant to which such Obligor purchased a Timeshare Interest.

"Purchase Price" is defined in Section 2.5.

"Purchaser" is defined in the introductory paragraph.

"Qualifying Bid" means the offer to purchase submitted by Purchaser as set forth in this Agreement, as well as any other bid that seeks to effect an acquisition of all of the Acquired Assets by a party that has provided Sellers with reasonable evidence of its ability to close timely the purchase of Acquired Assets in accordance with the terms of this Agreement.

"Real Property" means all real property of the Sellers as more specifically set forth in Section 2.1(d) hereof, excluding the real property described in Schedules 2.2(iii) through 2.2(viii) hereto, together with (a) all improvements located thereon, but expressly excluding improvements and structures owned by any tenant or other third party, (b) all right, title and interest of Sellers, if any, in and to the rights, privileges, easements, tenements, hereditaments and appurtenances thereon or in any way appertaining thereto, and (c) all right, title and interest of Sellers, if any, in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining the land.

"Rents" means income, rents, issues, profits, revenues, deposits, fees, accounts and other benefits from the operation of the Business on or after the Closing Date, including, without

# *EXHIBIT A*

limitation, all license fees, golf club and membership initiation fees, green fees, driving range fees, golf cart fees, membership fees and dues, revenues and credit card receipts collected from restaurants, bars, concessions, meeting rooms, snack bar, clubhouse, banquet rooms and recreational and health club facilities and otherwise, all receivables, customer obligations, installment payment obligations and other obligations arising on or after the Closing Date or created out of sale, lease, sublease, license, concession or other grant of the right of the possession, use or occupancy of all or any portion of the Business, or personalty located thereon, or rendering of services by any Seller or from the rental of any office space, retail space, commercial space, or other space, halls, stores, facilities or offices, including any deposits received on or after the Closing Date securing reservations of such space, exhibits or sales space of every kind, license, lease, sublease and concession fees and rentals, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance relating to the use, enjoyment or occupancy of the Resort accruing on or after the Closing Date.

"Reservation System" means the reservation system operated by one or more of the Sellers in connection with the operation and management of the Club and as described in the Membership Plan, and any other system(s) of Sellers pursuant to which reservations for particular locations, times, lengths of stay and unit types at Resorts are received, accepted, modified or canceled.

"Resort" means each of the timeshare resorts and/or properties within the Club and subject to the Membership Plan itemized on Schedule 1(d). The term "Resort" shall have the same meaning as "Timeshare Resort" as defined in the Membership Plan.

"Sale Hearing" is defined in Section 9.1.

"Sale Hearing Date" is defined in Section 9.1.

"Sale Motion" is defined in Section 9.1.

"Sale Notice" is defined in Section 9.3(a).

"Sale Order" means an order of the Bankruptcy Court, in form and substance acceptable to Purchaser and in substantially in the form of Exhibit A attached hereto, that, among other things, (a) approves this Agreement and the transactions contemplated hereby in all respects, which transfers the Acquired Assets and Assumed Liabilities, and assigns all executory contracts and unexpired leases set forth on Schedule 2.1(i)(l), to Purchaser free and clear of all liens, claims, and encumbrances as provided in sections 363 and 365 of the Bankruptcy Code such that, after the Closing, non-debtor parties shall be barred and enjoined from asserting against Purchaser, among other things, claims, defaults, breaches, or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (b) provides that the provisions of Rules 6004(g) and 6006(d) are waived and there will be no stay of execution under Rule 62(a) of the Federal Rules of Civil Procedure; (c) includes a finding that Purchaser is a good faith purchaser of pursuant to section 363(m) of the Bankruptcy Code and is entitled to all protections thereunder; (d) includes a finding that this Agreement was negotiated, proposed and entered into at arm's length; (e) includes a finding that proper notice of the sale was given and that no further notice was

# *EXHIBIT A*

required, and (f) includes a finding that the Transactions contemplated by this Agreement are fair and reasonable and in the best interest of the Sellers, their creditors, and their bankruptcy estates.

"<u>Schedule</u>" means each Schedule set forth on the attached "List of Schedules", as each such Schedule may be amended by the Parties on or before seven (7) days prior to the Auction.

"<u>Schedule of Timeshare Loans</u>" means the list of Timeshare Loans attached to the Agreement as <u>Schedule 1(e)</u> hereto, as amended from time to time prior to Closing to reflect additional purchases, repurchases and substitutions during the Closing Period, shall set forth the following information with respect to each Timeshare Loan as of the Cut-Off Date in numbered columns:

| | |
|---|---|
| 1 | Loan/Contract Number |
| 2 | Name of Obligor |
| 3 | Interest Rate Per Annum |
| 4 | Date of Origination |
| 5 | Original Loan Balance |
| 6 | Maturity Date |
| 7 | Monthly Payment Amount |
| 8 | Original Term (in months) |
| 9 | Outstanding Loan Balance |
| 10 | Name of Originator |

"<u>Seller</u>" or "<u>Sellers</u>" are defined in the introductory paragraph.

"<u>Settlement Statement</u>" is defined in Section 6.4(a)(xv).

"<u>Successful Bid</u>" is defined in Section 9.3(e).

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local, or foreign taxes, assessment, duties, fees, levies, imposts, deductions, or withholdings, including income, gross receipts, ad valorem, value added, excise, real or personal property, asset, sales, use, license, payroll, transaction, capital, net worth, franchise taxes, estimated, withholding, employment, social security, workers compensation, environmental, utility, severance, production, unemployment compensation, occupation, premium, windfall profits, transfer, filing, documentary, recording, mortgage, gains, or other tax or governmental charge of any nature whatsoever, imposed by any Taxing Authority of any government or country or political subdivision of any country, and any liabilities with respect thereto, including any penalties, additions to tax, fines, or interest thereon and includes any liability for Taxes of another person by contract, as a transferee or successor, under Treasury Regulation Section 1.1502–6 or analogous state, local, or foreign law provision or otherwise.

"<u>Tax Return</u>" means any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Taxing Authority in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any law relating to any Tax, including any schedule or attachment thereto and any amendment thereof.

9

# EXHIBIT A

"Taxing Authority" means the Internal Revenue Service and any other federal, state, local, or foreign governmental authority, agency, or instrumentality responsible for the administration or imposition of any Tax.

"Textron" means Textron Financial Corporation or any Affiliate thereof.

"Textron Loans" means the existing Secured Construction and Mortgage Loan and the TFC Hypothecation Line of Credit made by Textron to the Sellers at a balance not to exceed Twenty-Three Million Eight Hundred Fifteen Thousand Three Hundred Thirty Nine Dollars ($23,815,339) as of the Closing Date.

"Timeshare Documents" means all documents executed by a purchaser of a Timeshare Interest.

"Timeshare Interest" means any timeshare interest or individual membership in the Club and currently owned by the Club, subject to Premiere Development Incorporated's exclusive right to sell, assign, transfer or otherwise convey such Timeshare Interests in accordance with the Membership Plan, whether or not coupled with a fee simple interest in real estate, together with all rights, benefits, privileges and interest appurtenant thereto, including the right to use and occupy one or more residential units within an applicable Resort and the common areas and common furnishings appurtenant to such unit for a specified period of time, on an annual or biennial basis, as more specifically described in the Membership Plan and any applicable document or instrument governing the Club.

"Timeshare Laws" means the provisions of any applicable laws, statutes or regulations and all amendments, modifications, or replacements thereof and successors thereto, and all regulations and guidelines promulgated thereunder or with respect thereto, currently in effect, with respect to Timeshare Interests, including, but not limited to, the Arizona "Timeshare Act", ARIZ. REV. STAT. §§ 32-2197 *et seq*.

"Timeshare Loan Documents" means, with respect to a Timeshare Loan and each Obligor, the related (a) Timeshare Loan Files and (b) Timeshare Loan Servicing Files.

"Timeshare Loan File" means, for each Timeshare Loan, the following documents executed by Obligor or delivered in connection with such Timeshare Loan:

i. the original Obligor Note bearing all intervening endorsements showing a complete chain of endorsements from the originator of such Timeshare Loan to the last endorsee, endorsed by the last endorsee, without recourse, in the following form: "Pay to the order of _____ , without recourse" and signed in the name of the last endorsee by an authorized officer;

ii. if such Timeshare Loan is a Mortgage Loan, the original Mortgage or deed of trust containing the original signatures of all persons named as the maker, the mortgagor or trustor with evidence of recording indicated; provided, however, that no such original Mortgage shall be required if included among the applicable Timeshare Loan File is a certified copy of the recorded Mortgage;

10

iii.     if such Timeshare Loan is a Mortgage Loan, an original individual or bulk assignment of Mortgage in blank and signed in the name of the last endorsee by an authorized officer;

iv.     if such Timeshare Loan is a Mortgage Loan, the originals of all intervening assignments (or a copy certified to the custodian of the Timeshare Loan File) of the Mortgage (if applicable) showing a complete chain of assignments from the originator of such Mortgage Loan to the Last Endorsee;

v.     if such Timeshare Loan is a Mortgage Loan, an original or a copy of any assumption or modification of the Obligor Note or Mortgage with evidence of recording thereon;

vi.     the original or a copy of the Purchase Contract that relates to each Obligor Note, including any addenda thereto;

vii.     the original (or copies) of the truth-in-lending disclosure statement and RESPA statements for the jurisdictions in which the Resorts or Club are located, guaranties, addenda, riders, indemnity agreements, and other documents, instruments and correspondence, together with credit reports, current automated payment information (including credit card, bank draft and check by facsimile) and computer records of every type whether in hard copy or electronic format relating to each Timeshare Loan.

"Timeshare Loan Servicing File" means, with respect to each Timeshare Loan and each Obligor a copy of such portions of the related Timeshare Loan File held by the Timeshare Loan servicer and all other papers and computerized records maintained by the applicable Timeshare Loan servicer in servicing the Timeshare Loans.

"Timeshare Loans" means all of the Mortgage Loans, loans that are secured by a Timeshare Interest sold on or before the Effective Date, and In-Transit Loans originated and held by the Sellers.  "Timeshare Loan" means any one of the same.

"Timeshare Property" means a "stand alone" timeshare fee simple interest in real estate regarding a unit or Resort which is not subject to the Membership Plan and which is not owned by the Club, however denominated or defined in the applicable condominium or timeshare declaration, pursuant to which such fee simple interest in real estate is created, together with all rights, benefits, privileges and interests appurtenant thereto, including the common areas and common furnishings appurtenant to such unit.

"Title Company" means First American Title Insurance Company located at 1160 North Town Center Drive, Suite 190, Las Vegas, Nevada 89144.

"Title Policies" means the following title policies to be obtained by Purchaser in accordance with Section 2.7 below: (1) an ALTA standard Owner's Policy of Title Insurance for the Timeshare Property and the Real Property and (2) an Eagle 9 UCC Vacation Interest Policy for the unsold Timeshare Interests.

"Trademark License" means any oral or written agreement now in existence, as may be amended, supplemented or otherwise modified from time to time, by which (a) any Seller is

11

# EXHIBIT A

granted any right to use any trademark, service mark, trade name, corporate name, company name, business name, fictitious business name, trade style, trade dress or logo; or (b) any Seller grants the right to use any trademark, service mark, trade name, corporate name, company name, business name, fictitious business name, trade style, trade dress or logo.

"Trademarks" means collectively all of the following now owned by or on behalf of any Seller: (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, service marks, logos, other business identifiers, prints and labels on which any of the foregoing have appeared or appear, as listed on Schedule 1(f); (b) all registrations and recordings thereof, and all applications in connection therewith; (c) all renewals thereof; (d) all income, royalties, damages and payments now or hereafter due and/or payable under any of the foregoing or with respect to any of the foregoing, including, without limitation, damages and payments for past, present and future infringements of any of the foregoing; (e) the right to sue for past, present and future infringements of any of the foregoing; (f) all rights corresponding to any of the foregoing throughout the world; and (g) all goodwill associated with and symbolized by any of the foregoing.

"Transactions" means the transactions contemplated by this Agreement.

"UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of Arizona.

"Vehicles" means all cars, trucks, trailers, golf carts, landscaping equipment, construction equipment and earth moving equipment and other vehicles covered by a certificate of title law of any state and, in any event, shall include, without limitation, the vehicles listed on Schedule 1(g) hereto and all tires and other appurtenances to any of the foregoing.

## ARTICLE 2.
## PURCHASE AND SALE OF ACQUIRED ASSETS

2.1     Purchase and Sale.   Upon the terms and subject to the conditions contained herein, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, accept, and acquire from Sellers, good and marketable title, free and clear from all Liens (other than Permitted Exceptions), to all assets of Sellers as of the Closing Date, including but not limited to the following listed assets, properties, and rights, all of which shall be sold "as is" and "where is", with no representations or warranties from Sellers except as set forth herein, but subject to any assignable warranties or other rights Sellers may have against any third party with respect thereto, other than the Excluded Assets (all of the assets and rights to be sold and purchased hereunder are referred to herein collectively as the "Acquired Assets"):

(a)     all of Sellers' rights under all Contracts, including, inter alia:

(i)     all those executory Contracts, if assignable, relating to the Acquired Assets or Assumed Liabilities that relate to the Business, as set forth in Schedule 2.1(i)(l), that are assumed and assigned in accordance with Section 365 of the Bankruptcy Code by order of the Court; and

12

# *EXHIBIT A*

(ii) all Property Management Agreements, including agreements between Sellers and: (a) Kohl's Ranch Owners' Association; (b) The Inn at Los Abrigados Owners Association; (c) Premiere Vacation Club; (d) ILX Bell Rock Incorporated; (e) Golden Eagle Resort, Inc.; (f) Varsity Clubs of America – South Bend Chapter; (g) Varsity Clubs of America – Tucson Chapter; (h) Sedona Vacation Club; and (i) any other management contracts or similar contracts to provide management services for a fee, all as set forth on <u>Schedule 2.1(i)(2)</u>.

(b) all of Sellers' Accounts, including, inter alia, all Timeshare Loans as set forth on the Schedule of Timeshare Loans attached hereto as <u>Schedule 1(e)</u>, including Timeshare Loans in default or in process of foreclosure, together with inter alia, all Timeshare Loan Files, or certified copies thereof (or copies of custodial receipts evidencing the custody and contents thereof), exclusive of Resort Funding LLC's holdbacks and Timeshare Loans and the M&I Timeshare Loans, as set forth on <u>Schedule 2.1(ii)(1)</u>; provided, however, that all proceeds in excess of Five Hundred Thousand Dollars ($500,000), of the pre-petition ineligible receivables that are ninety (90) days or less delinquent, as set forth on <u>Schedule 2.1(ii)(2)</u>, will be remitted to the unsecured creditor pool (the $500,000 is inclusive of forgiveness of bad debt and upgrades);

(c) One Hundred Percent (100%) of Sellers' unsold Timeshare Interests wherever located and however held, including (i) Declarants' Rights with respect to Club memberships, including those that are in default, (ii) all unsold Timeshare Interests in the Club immediately prior to the Closing Date as set forth on <u>Schedule 2.1(iii)</u>, it being understood and for the purpose of clarity, Premiere Development Incorporated shall cause Club to transfer all unsold Timeshare Interests the Club holds to Purchaser on the Closing Date;

(d) all Real Property of the Sellers, as more particularly described in <u>Schedule 2.1(iv)</u> and FF&E owned by the Sellers, including, <u>inter alia</u>, (i) all sales and marketing centers; (ii) the lease with Indian Wells Partners for 91 Portal Lane in Sedona, Arizona; and (iii) all other leases assumed by Purchaser as set forth on <u>Schedule 2.1(iv)</u>;

(e) all rights of Sellers as declarant, developer, or seller under the Membership Plan and any other Resort-related, Timeshare Property-related, Club-related or other Real Property-related document or instrument listed on <u>Schedule 2.1(v)</u> (collectively, the "<u>Declarants' Rights</u>"), including, <u>inter alia</u>, all rights of any of the Seller, including Premiere Development Incorporated, as seller under the Membership Plan; and

(f) all other Seller's assets, including, but not limited to: (i) pre-paid marketing certificates; (ii) all books and records related to sold Timeshare Interests and sold Timeshare Property, including Purchase Contracts, which books and records constitute all Purchase Contracts and records related to the sale of Timeshare Interests and Timeshare Property held by Sellers; (iii) all Reservation Systems, including the Gipsy Software system; and (iv) to the extent not included above, all Intellectual Property, Documents, Instruments and General Intangibles.

13

# *EXHIBIT A*

2.2     Excluded Assets.  Notwithstanding Section 2.1 hereof, the Acquired Assets will not include the following (the "Excluded Assets"):

(a)     merchant deposits made by or received by Sellers, including inter alia, those as set forth on Schedule 2.2(i);

(b)     income tax refunds from any Taxing Authority accrued with respect to the conduct of the Business of Sellers or their affiliates;

(c)     the 14.174 acre parcel known as U S Forest Service Parcel A located in the SE ¼ Section 7, T.17N, R.6E., G. & S.R.M., Coconino County, Arizona; as legally described in Schedule 2.2(iii) hereto, including all plants, buildings, fixtures, and other improvements located thereon, and all easements, licenses, rights of way, permits, and all appurtenances to such property;

(d)     the approximate three (3) acre parcel of land known as a portion of U.S. Forest Service Parcel B located in Sedona, AZ as legally described in Schedule 2.2(iv) hereto, that is subject to a mortgage in favor of Resort Funding LLC;

(e)     the approximate five (5) acres of real property (zoned multi-family) located in Bullhead City Arizona as legally described in Schedule 2.2(v) hereto, including all plants, buildings, fixtures, and other improvements located thereon, and all easements, licenses, rights of way, permits, and all appurtenances to such property;

(f)     the 2.1 acres of real property located in Puerto Peñasco (Rocky Point), Sonora, Mexico as legally described in Schedule 2.2(vi) hereto, including all plants, buildings, fixtures, and other improvements located thereon, and all easements, licenses, rights of way, permits, and all appurtenances to such property;

(g)     the approximate three (3) acre parcel of land known as a portion of U.S. Forest Service Parcel B located in Sedona, AZ as legally described in Schedule 2.2(vii) hereto, including all plants, buildings, fixtures, and other improvements located thereon, and all easements, licenses, rights of way, permits, and all appurtenances to such property, subject to a replacement lien held by M&I Bank;

(h)     the real property located at 41 Mormon Hill Road as legally described in Schedule 2.2(viii) hereto, including all plants, buildings, fixtures, and other improvements located thereon, and all easements, licenses, rights of way, permits, and all appurtenances to such property, subject to a mortgage in favor of Irwin Union Bank;

(i)     Equipment leased by Sellers on long-term operating leases, except as expressly assumed in Section 2.1(a)(i) of this Agreement;

(j)     Timeshare Loans owned by Resort Funding, LLC;

(k)     holdbacks held by Resort Funding, LLC and owed to Sellers, as set forth on Schedule 2.2(x);

(l)     the M&I Timeshare Loans set forth in <u>Schedule 2.1(ii)(1)</u>;

(m)     any assets that may not be acquired or assigned by Law;

(n)     employee advances;

(o)     utility and other deposits made by Sellers on or before the Closing Date;

(p)     all cash and cash equivalents, including cash on hand or in bank accounts, certificates of deposit, and commercial paper;

(q)     all equity interests of Sellers and any of Sellers' subsidiaries or stock or other ownership interests owned by Sellers in any other person;

(r)     executory contracts of Sellers that are not expressly assumed in Section 2.1(a)(i) of this Agreement; and

(s)     the corporate seals, Articles of Incorporation, minute books, stock books, Tax Returns, or all other records having to do with the corporate organization or operations of Sellers or their subsidiaries.

2.3     Assumption of Liabilities.  Subject to the terms and conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer, and delivery of the Acquired Assets to Purchaser, Purchaser will assume and pay, perform, and discharge when due and otherwise in accordance with the terms of this Agreement, only the following liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a)     the Textron Loans, except to the extent that they have been paid at Closing;

(b)     liabilities accruing from and after the Closing Date with respect to Contracts assumed or acquired as provided by Section 365 of the Bankruptcy Code;

(c)     all obligations of Sellers as declarant, developer or seller under the Membership Plan and any other Resort-related, Timeshare Property-related, or Club-related document or instrument accruing from and after the Closing Date, all as set forth on <u>Schedule 2.3(iii)</u>, including obligations to subsidize or pay dues with respect to Homeowner Associations;

(d)     obligations accruing from and after the Closing Date to honor all existing owner reservations and Interval International bankings and/or reservations and all other guest reservations for accommodations and facilities as set forth on <u>Schedule 2.3(iv)</u> or reflected in Sellers' Reservation System;

(e)     liabilities with respect to loans made by M&I Bank to Sedona Vacation Club and Premiere Vacation Club, respectively, as set forth on <u>Schedule 2.3(v)</u>;

(f)    unpaid property taxes on the Acquired Assets and of the Homeowner Associations; and

(g)    the lease obligation with Indian Wells Partners for 91 Portal Lane in Sedona, Arizona and payments relating thereto accruing from and after the Closing Date.

2.4    Excluded Liabilities.  Sellers shall retain all liabilities and obligations that are not Assumed Liabilities.

2.5    Purchase Price.  The purchase price (the "Purchase Price") for the Acquired Assets shall be an amount equal to Twenty-Nine Million Six Hundred Seventy-Two Thousand Two Hundred Fifty-One Dollars ($29,672,251), payable as follows:  (a) One Hundred Thousand Dollars ($100,000) in earnest money (the "Earnest Money Deposit") deposited by check or wire transfer to Sellers on or before the date for submission of bids under the Bidding Procedures as established in the Procedures Order; (b) cash in the amount of Five Million Eight Hundred Fifty-Six Thousand Nine Hundred Thirteen Dollars ($5,856,913); and (c) assumption of the outstanding obligations evidenced by the Textron Loans.

2.6    Closing.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets (the "Closing") shall take place at the offices of Sellers within ten (10) Business Days following the date on which the last condition under Article 6 has been satisfied or waived, or at such other time and place as the Parties may mutually agree.  If appropriate under the circumstances, the Parties will exchange copies of the documents necessary to consummate the Transaction by facsimile (or other appropriate electronic means), the receipt of which will be confirmed by telephone.

2.7    Title and Purchaser's Conditions Precedent.

(a)    Commitment for Title Insurance.  Purchaser shall obtain from Title Company within ten (10) days from the Effective Date, the Commitment.

(b)    Title Insurance.  At Closing, the Title Policies shall be issued through Title Company to Purchaser in the face amount of the Purchase Price, and shall insure fee simple title to the Real Property in Purchaser, and shall insure use and occupancy rights to the unsold Timeshare Interests in Purchaser.  Purchaser shall pay the title insurance premium for the Title Policies.  Purchaser shall have the right to obtain extended coverage for the Title Policies at its expense.  Purchaser hereby disapproves the title exceptions set forth in Schedule 2.7(ii) and Seller hereby agrees to remove all such disapproved exceptions that can be removed by payment of a liquidated monetary amount, and to remove or remedy all such non monetary exceptions, prior to Closing. Purchaser hereby approves all of the other exceptions set forth in the Commitment and such exceptions are deemed to be "Permitted Exceptions."  Seller agrees to execute at Closing all forms and reports required for tax reporting purposes, including federal and state income tax reporting and a declaration of value required by the county assessor's office.  Seller further agrees to deliver all other documents, instruments, or affidavits which are customary in a real estate closing in the county where the closing is held, or

which reasonably may be required by the Title Company to effect the Closing hereunder and the issuance of the Title Policies.

(c)    License.  Seller hereby grants to Purchaser a limited license to enter and inspect the Resorts and the Real Property escorted by a representative of Seller at reasonable, pre-approved times and in a manner reasonably acceptable to Seller.  Such inspection shall be conducted in a manner that does not damage the Resort and the Real Property or any improvements or other property thereon, or interfere with the business operations conducted at the Resorts and the Real Property, if any.  Purchaser agrees to indemnify and hold Seller harmless from and against any and all claims, costs, damages, liabilities or losses arising as a result of or in any way connected with Purchaser's inspection of the Resorts and the Real Property.

2.8    Allocation of Purchase Price.  Sellers and Purchaser shall cooperate in the preparation of a joint schedule (the "Allocation Schedule"), allocating the Purchase Price (including, for purposes of this Section, any other consideration paid by Purchaser) among the Acquired Assets.  Sellers and Purchaser each agree to file Internal Revenue Service Form 8594 and any required attachments thereto, together with all Tax Returns, in accordance with the Allocation Schedule.  Sellers and Purchaser each agree to promptly provide the other with any other information required to complete the Allocation Schedule.  If, however, Sellers and Purchaser are unable to complete such schedule within one hundred twenty (120) days following the Closing, or by such later date as agreed to in writing by the Parties, each of Sellers and Purchaser may file Form 8594, and any Tax Returns, allocating the Purchase Price in the manner each believes appropriate, provided such allocation is reasonable and in accordance with Section 1060 of the Internal Revenue Code and the regulations thereunder.

2.9    Closing Period Issues.  It is the current intention of Purchaser to engage many of Sellers' employees after Closing.  During the Closing Period, Purchaser shall notify Sellers of the names of all current Resort-related and Club-related employees and independent contractors whom Purchaser, in its sole discretion, may elect to engage upon Closing.  Sellers shall promptly provide Purchaser with copies of any existing employment or independent contractor agreements to which any such named individuals are parties.  Sellers expressly acknowledge that Purchaser shall have no obligation whatsoever to hire any current Resort-related or Club-related employees or independent contractors, even those so named during the Closing Period.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller, jointly and severally, represents and warrants to Purchaser as follows.

3.1    Existence; Authorization.  Each Seller is lawfully existing and in good standing under the laws of the state of its organization and has all requisite power and authority to enter into this Agreement and to perform the obligations to be performed by it under this Agreement.  The execution and delivery of this Agreement, and the performance by each Seller of its obligations hereunder, have been duly authorized by all necessary action on the part of such Seller.  To the extent required, each of the Sellers, including, without limitation, Premiere

17

# *EXHIBIT A*

Development Incorporated, are authorized to take actions related to such Seller as necessary to consummate any of the transactions contemplated by this Agreement.

3.2     Enforceability.     This Agreement and each other agreement, document or instrument, or certificate contemplated by this Agreement has been duly executed and delivered by Sellers and are legal, valid, and binding obligations of each Seller, enforceable against Sellers in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

3.3     No Conflicts or Consents.     To the best of Sellers' knowledge, neither the execution, delivery, and performance by Sellers of this Agreement, nor the consummation of the Transactions by Sellers, will (a) constitute, with or without the giving of notice or passage of time or both, a breach, violation, or default by Sellers or any of their Affiliates, create a Lien, or give rise to any right of termination, modification, cancellation, prepayment, or acceleration, under (i) any Law or license, subject to the provisions of any such Law, or (ii) any note, bond, mortgage, indenture, lease, agreement, or other instrument, in each case that is applicable to or binding upon Sellers or any of their assets except as may arise from rejection of executory contracts or non-assignability of contracts or leases; (b) require any Consent, other than from Textron; or (c) violate any Law by which Sellers are bound.

3.4     Ownership.     Sellers, to the best of their knowledge, are the sole and exclusive owners of (a) fee simple or other legal title to the unsold Timeshare Property acquired by Purchaser and all other acquired Real Property; and (b) Declarants' Rights with respect to the Timeshare Interests; and (c) holder of all of the Timeshare Loans acquired by Purchaser, with the right to enforce all Timeshare Loan Documents evidencing or securing the Timeshare Loans; and (d) the remainder of the Acquired Assets, with full right and authority to convey said real and personal property without the consent, approval, or waiver of any party other than as set forth in Schedule 3.4.  The Acquired Assets, together with the Excluded Assets, comprise one hundred percent (100%) of the assets owned by the Sellers.  Except as otherwise expressly provided herein to the contrary or as otherwise set forth on Schedule 3.4, all of the Acquired Assets will be conveyed, assigned, and transferred to Purchaser on the Closing Date, free and clear of any liens, charges, pledges, security interests, or other encumbrances of any type other than the Permitted Exceptions.

3.5     Licenses and Permits.     Sellers, to the best of their knowledge, have obtained all material licenses, permits, consents, authorizations, approvals, franchises, waivers, exemptions, and orders as are reasonably necessary or appropriate in order for Sellers legally to carry on their businesses as they are now being conducted in connection with the Resorts, the Club, and the Acquired Assets (hereinafter collectively referred to as "Licenses").  To the best of Sellers' knowledge, all such Licenses are in full force and effect, no material violations have occurred with respect thereto, and no proceeding is currently pending or, to the best of Seller's knowledge, threatened to revoke, suspend, or terminate any License.  To the best of Sellers' knowledge, no condition exists or event has occurred other than the Bankruptcy Case or any change in management or control as a result of the Transaction which, by itself or with the giving of notice, the lapse of time, or both, may result in the suspension, revocation, impairment, forfeiture, or non-renewal of any License.

18

# EXHIBIT A

3.6     Assessments.  Except as set forth on <u>Schedule 3.6</u>, Sellers have paid and will continue to pay through and including the Closing Date and in accordance with Sellers' past practices all condominium, timeshare, and other owners' association assessments, maintenance fees, Club dues, and subsidy amounts for which any Seller, as developer or otherwise is obligated, whether by law or pursuant to any documents or instruments related to the Club or any of the Resorts, in connection with the unsold Timeshare Interests.

3.7     Compliance with Settlement Agreement.  Sellers, to the best of their knowledge, are in material compliance with the terms and conditions of the settlement agreement entered into on March 30, 2005 resolving the class action lawsuit captioned *Reed v. ILX Resorts Incorporated*, No. CV2003-0491.

3.8     No Material Misrepresentations or Omissions.  To Sellers' knowledge, none of the representations or warranties of Sellers contained herein are untrue or misleading in any material respect, and all such representations and warranties shall remain true and correct in all respects through and including the Closing Date.  Except as set forth on <u>Schedule 3.8</u>, Sellers know of no fact that does or could materially and adversely affect the operation of the Acquired Assets.

3.9     Except as set forth on <u>Schedule 3.9</u>, Sellers do not know of any matters relating to their compliance with Timeshare Laws that would cause a material adverse impact on the Business.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

4.1     Existence; Authorization.  Purchaser is lawfully existing and in good standing under the laws of the state of its organization, has all requisite power and authority to enter into this Agreement and to perform the obligations to be performed by it under this Agreement.  The execution and delivery of this Agreement, and the performance by Purchaser of its obligations hereunder, have been duly authorized by all necessary action on the part of Purchaser.

4.2     Enforceability.  This Agreement has been duly executed and delivered by Purchaser and is a legal, valid, and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

4.3     No Conflicts or Consents.  Neither the execution, delivery, and performance by Purchaser of this Agreement, nor the consummation of the Transactions by Purchaser, will (a) constitute, with or without the giving of notice or passage of time or both, a breach, violation, or default by Purchaser or any of its Affiliates, create a Lien, or give rise to any right of termination, modification, cancellation, prepayment, or acceleration, under (i) any Law or license or (ii) any note, bond, mortgage, indenture, lease, agreement, or other instrument, in each case that is applicable to or binding upon Purchaser; (b) require any Consent; or (c) violate any Law by which Purchaser is bound.

19

# EXHIBIT A

3.6  Assessments.  Except as set forth on Schedule 3.6, Sellers have paid and will continue to pay through and including the Closing Date and in accordance with Sellers' past practices all condominium, timeshare, and other owners' association assessments, maintenance fees, Club dues, and subsidy amounts for which any Seller, as developer or otherwise is obligated, whether by law or pursuant to any documents or instruments related to the Club or any of the Resorts, in connection with the unsold Timeshare Interests.

3.7  Compliance with Settlement Agreement.  Sellers, to the best of their knowledge, are in material compliance with the terms and conditions of the settlement agreement entered into on March 30, 2005 resolving the class action lawsuit captioned *Reed v. ILX Resorts Incorporated*, No. CV2003-0491.

3.8  No Material Misrepresentations or Omissions.  To Sellers' knowledge, none of the representations or warranties of Sellers contained herein are untrue or misleading in any material respect, and all such representations and warranties shall remain true and correct in all respects through and including the Closing Date.  Except as set forth on Schedule 3.8, Sellers know of no fact that does or could materially and adversely affect the operation of the Acquired Assets.

3.9  Except as set forth on Schedule 3.9, Sellers do not know of any matters relating to their compliance with Timeshare Laws that would cause a material adverse impact on the Business.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

4.1  Existence; Authorization.  Purchaser is lawfully existing and in good standing under the laws of the state of its organization, has all requisite power and authority to enter into this Agreement and to perform the obligations to be performed by it under this Agreement.  The execution and delivery of this Agreement, and the performance by Purchaser of its obligations hereunder, have been duly authorized by all necessary action on the part of Purchaser.

4.2  Enforceability.  This Agreement has been duly executed and delivered by Purchaser and is a legal, valid, and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

4.3  No Conflicts or Consents.  Neither the execution, delivery, and performance by Purchaser of this Agreement, nor the consummation of the Transactions by Purchaser, will (a) constitute, with or without the giving of notice or passage of time or both, a breach, violation, or default by Purchaser or any of its Affiliates, create a Lien, or give rise to any right of termination, modification, cancellation, prepayment, or acceleration, under (i) any Law or license or (ii) any note, bond, mortgage, indenture, lease, agreement, or other instrument, in each case that is applicable to or binding upon Purchaser; (b) require any Consent; or (c) violate any Law by which Purchaser is bound.

19

2680546.2

Case 2:09-bk-03594-RTBP    Doc 453    Filed 06/14/10    Entered 06/14/10 12:56:39    Desc Main Document    Page 41 of 62

# EXHIBIT A

## ARTICLE 5.
## COVENANTS AND OTHER AGREEMENTS

5.1    Consummation of Transactions.  From and after the date of this Agreement, each Party shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable and consistent with applicable Law to perform its obligations under this Agreement and to consummate the Transactions as soon as reasonably practicable.

5.2    Compliance with Law.  Prior to Closing, Sellers shall comply in all material respects with Law applicable to the Acquired Assets.

5.3    Certain Notices.  Each Party shall promptly notify the other Party in reasonable detail:

(a)    upon the commencement of, or the impending or threatened commencement of, or upon obtaining knowledge of any facts that would give rise to, any claim, action, or proceeding brought to enjoin the consummation of the Transactions, or against or relating to the notifying Party or its properties or assets, that could materially adversely affect the Transactions or such Party's ability to perform its obligations hereunder;

(b)    upon the occurrence of, or the impending or threatened occurrence of, or upon obtaining knowledge of any facts that would give rise to, any event that could cause or constitute a material breach of any of its representations, warranties, covenants, or agreements contained in this Agreement, and shall use commercially reasonable efforts to prevent or promptly remedy such breach; and

(c)    upon the occurrence or existence of any event, condition, circumstance, or state of facts known to the notifying Party that has had or could have a material adverse effect on the Transactions or such Party's ability to perform its obligations hereunder.

5.4    Confidentiality.  Pursuant to this Agreement and the performance thereof, Purchaser may receive certain Confidential Information.  Purchaser shall not use for itself, except in performance of the Agreement, or disclose to any Person, this Agreement or any Confidential Information except (a) information that was gained independent of Purchaser's relationship with the Sellers and became publicly available through no breach of any obligation of confidentiality by Purchaser; (b) information that is communicated to a third party with the prior written consent of Sellers; or (c) information that is required to be disclosed pursuant to the lawful order of a government agency or a court of competent jurisdiction or disclosure that is required by operation of law, but in such event, only to the extent such disclosure is required and, to the extent reasonably practicable, prior written notice must be given to allow Sellers, in their sole discretion, to seek a protective order or other appropriate remedy.  In the event of a breach or threatened breach of the terms of this section, Sellers shall be entitled to seek an injunction prohibiting any such breach.  Any such injunctive relief shall be in addition to, and not in lieu of, any appropriate relief in the way of money damages or any other remedies available at law or in equity.  In the event that the Transaction is not consummated, this Agreement is terminated for

20

any reason, or Purchaser's bid is not the Successful Bid at an Auction, Purchaser shall return or destroy all Confidential Information of Sellers received by Purchaser.

5.5     Affirmative Covenants.  Between the Effective Date and the Closing Date:

(a)     <u>Continuation of Business</u>.  Sellers shall: (i) use their best efforts to conduct the operations of each Resort and Club in accordance with its past practices and in a commercially reasonable manner; (ii) maintain the present physical and operating conditions, reasonable wear and tear excepted, and the present legal status of each Resort, Club and all Acquired Assets; (iii) use their reasonable commercial efforts to preserve intact its current business organization, maintain the services of its employees and independent contractors, and maintain its relations and good will with suppliers, customers, creditors, and others having business relationships with Sellers; (iv) provide reasonable access to Purchaser to Seller's management during normal business hours for the purpose of staying informed concerning the business, operations, and finances of Sellers, each Resort, the Club and all Acquired Assets; and (v) maintain all Timeshare Documents and Timeshare Loan Documents in accordance with past practices.

(b)     <u>Compliance with Law</u>.  Sellers shall use their best efforts to comply with all Laws and notify Purchaser immediately in the event that Sellers become aware of a material violation of any Law to which Sellers and/or all or any portion of any Resort, Club, or any of the Acquired Assets is subject.

(c)     <u>Timeshare Loan Collections Following the Cut-Off Date</u>.  All payments, if any, received by Sellers or on Sellers' behalf in respect of any of the Timeshare Loans after the Closing Date shall be held in trust by such receiving party for the benefit of Purchaser and remitted to or for the benefit of Purchaser within five (5) days calendar following the receipt thereof.

5.6     Negative Covenants.  Between the Effective Date and the Closing Date, Sellers shall not, without the prior written consent of Purchaser:

(a)     sell, lease, offer for sale or lease, convey, assign, encumber, or otherwise transfer in any manner whatsoever all or any portion of any Resort, Club, or any of the Acquired Assets other than in the ordinary course of business;

(b)     amend, modify, restate, terminate, or otherwise alter in any manner whatsoever, other than non-renewal or termination in accordance with its terms, or breach the terms of, any contract, instrument, agreement, or document of any type that relates, directly or indirectly, to any of the Resorts, Club, or any of the Acquired Assets other than in the ordinary course of business;

(c)     engage in any extraordinary transactions related, directly or indirectly, to any Resort, Club, or any of the Acquired Assets;

(d)     enter into any leasing or licensing agreements, take-or-pay arrangements, or other affiliations, alignments, or any agreements with respect to, or that encumber, any Resort, Club, or any of the Acquired Assets, other than in the ordinary course of business;

21

(e)     take any action that would have the effect of materially diminishing the value of any Resort, Club, or any of the Acquired Assets, excluding reductions in Inventory, Timeshare Interests, and Timeshare Loans in the ordinary course of business;

(f)     take any action that would make Sellers' representations and warranties set forth in Article 3 not true and correct in all material respects;

(g)     take any action that would, or could reasonably be expected to, result in any of the conditions set forth in Article 6 not being satisfied; or

(h)     take any action that may in any way materially impair or restrict Purchaser's ability to utilize the Acquired Assets as contemplated by this Agreement.

5.7     Room Reservations.  On the Closing Date, all room reservations within Sellers' electronic systems shall be delivered to Purchaser, in a format agreed upon by Sellers and Purchaser.

5.8     Employees.  Sellers shall provide Purchaser reasonable access to Sellers' employees involved with the Business, and Purchaser may in its sole discretion, but is under no obligation to, interview and offer employment to any or all of such employees.

5.9     Publicity.  Neither Party shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party hereto, which approval will not be unreasonably withheld or delayed, unless disclosure is otherwise required by applicable Law; provided that, to the extent required by applicable Law, the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law to consult with the other Party with respect to the text thereof. Purchaser acknowledges that ILX Resorts Incorporated is a public company and is required to make certain public filings.  Purchaser agrees that it will make no public disclosure without prior approval from Sellers.

5.10     Non-Disparagement.  The Parties agree that they shall not make any disparaging or unsolicited remarks about any other Party or its Affiliates, whether true or untrue, to any third party including to financing entities, trade vendors, employees, shareholders, or journalists.

## ARTICLE 6.
## CONDITIONS TO CLOSING; CLOSING DELIVERIES; POST-CLOSING

6.1     Conditions to the Obligations of Both Parties.  Each Party's obligation to consummate the Transactions contemplated by this Agreement are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

(a)     no temporary restraining order, preliminary or permanent injunction, or other order, decree, or ruling issued by a Governmental Authority, nor any Law promulgated or enacted by any Governmental Authority, shall be in effect that would impose material limitations on the ability of either Party to consummate the Transactions; and

(b)     the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court.

6.2     Conditions to the Obligations of Sellers.  Sellers' obligation to consummate the Transactions contemplated by this Agreement are subject to Purchaser having delivered to Sellers the Purchase Price for the Acquired Assets pursuant to Section 2.5.

6.3     Conditions to the Obligations of Purchaser.   Purchaser's obligation to consummate the Transactions contemplated by this Agreement is subject to the satisfaction or waiver on or prior to the Closing Date of each of the following conditions:

(a)     there shall not be in effect a final, non-appealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting consummation of the Transactions;

(b)     the representations and warranties of Sellers contained herein shall be true and correct in all material respects as of the Closing as if made on and as of the Closing Date (except that representations and warranties that are made as of a specific date need be so true and correct only as of such date);

(c)     the covenants, conveyances, transfers, assignments, and agreements of Sellers to be performed under this Agreement on or prior to the Closing shall have been duly performed in all material respects;

(d)     the Bankruptcy Court shall have entered the Procedures Order in form and substance reasonably satisfactory to the Purchaser, which Procedures Order shall have remained in full and force and effect and shall not have been stayed, vacated, modified or supplemented without the Purchaser's prior written consent; and

(e)     the Bankruptcy Court shall have entered the Sale Order in form and substance reasonably satisfactory to the Purchaser, which Sale Order shall have remained in full and force and effect and shall not have been stayed, vacated, modified or supplemented without the Purchaser's prior written consent, and that, without limitation, (i) authorizes the sale to Purchaser of the Acquired Assets free and clear of all liens, claims, and encumbrances other than Permitted Exceptions and as set forth on Schedule 3.4, (ii) authorizes the assumption and assignment to Purchaser of those executory contracts and unexpired leases set forth on Schedule 2.1(i)(l) hereof, (iii) approves the assumption of the Assumed Liabilities, (iv) makes a finding that the Purchaser purchased the Acquired Assets in good faith and is not a successor to the Sellers, and (v) is effective immediately upon entry on the docket of the Bankruptcy Case.

6.4     Closing Deliveries.  Each Party's obligation to consummate the Transactions is conditioned on the delivery to such Party of each of the documents listed in this Section 6.4, unless such delivery is expressly waived by such Party in writing.

(a)     Documents Delivered by Seller at Closing.  Sellers shall deliver, or as to (vii) below shall cause Textron to deliver, the following documents to Purchaser or its

# EXHIBIT A

designated representative on the Closing Date, each in form and substance satisfactory to Purchaser:

(i)   Deeds.  Special warranty deeds in substantially the form of Exhibit B hereto, in recordable form in each applicable jurisdiction pursuant to which fee simple title to all unsold Timeshare Property and other acquired Real Property, free and clear of any liens or encumbrances except for the Permitted Exceptions and the rights and obligations of an owner or member under any applicable ownership or membership plan, is conveyed from Sellers to Purchaser or its designee.

(ii)   Bills of Sale.  Bills of sale in substantially the form of Exhibit C hereto, pursuant to which all of Seller's rights, title, and interest in and to the Miscellaneous Personal Property as defined therein and other personal property comprising the Acquired Assets are transferred to Purchaser or its designee, free and clear of any liens or encumbrances.

(iii)   Conveyance of Unsold Timeshare Interest.  Special warranty deed(s) in substantially the form of Exhibit D hereto, in recordable form to be recorded in Maricopa County and Coconino County, pursuant to which the unsold Timeshare Interests and all use and occupancy rights associated with the same, free and clear of all Liens except for the Permitted Exceptions and any rights and obligations of a Member as set forth in the Membership Plan, is conveyed by the Club to Purchaser or its designee.

(iv)   Assignments and Assumptions of Management Agreements; Execution of New Management Agreements.  An Assignment and Assumption of Management Agreements in substantially the form of Exhibit E hereto, pursuant to which all of Sellers' rights, title, and interest in and to each Property Management Agreement are transferred and assigned to Purchaser or its designee, and Purchaser or its designee assumes Seller's duties and obligations thereunder.

(v)   Assignments and Assumptions of Exchange Company Affiliation Agreements.  Assignment and Assumption Agreement of any and all of Seller's interest in exchange company affiliation agreements reasonably requested by Purchaser, to the extent assignable according to their terms.

(vi)   Master Assignment of Timeshare Loans.  A Master Assignment of Timeshare Loans in substantially the form of Exhibit F hereto, or such other conveyance documents sufficient to cause all of Seller's rights, title, and interest in and to the Timeshare Loans are transferred to Purchaser.  The original of each Obligor Note that evidences a Timeshare Loan shall be endorsed by an endorsement stamp or through an allonge to Purchaser or its designee, in the following manner: "Pay to the order of _____, without recourse, except as otherwise provided in that certain Asset Purchase Agreement dated as of _____ __, 2010, by and between _____ and _____."

(vii)    Timeshare Loan Files.  All Timeshare Loan Files.

(viii)    Characterization of Timeshare Loans.  A Certificate in the form of Exhibit G hereto, pursuant to which Sellers represent and warrant that the schedules of non-delinquent Timeshare Loans and delinquent Timeshare Loans attached thereto accurately characterizes to the best of Sellers' knowledge each Timeshare Loan as such as of the Cut-Off Date and that such schedules are otherwise true and correct in all material respects as of the Cut-Off Date.

(ix)    Assignments of Declarants' Rights.  Assignments of Declarants' Rights in substantially the form of Exhibit H hereto, pursuant to which all of Seller's rights, title, and interest in and to the Declarants' Rights are transferred to Purchaser or its designee.

(x)    Assignment of Intellectual Property.    An Assignment of Intellectual Property in substantially the form of Exhibit I hereto, pursuant to which all of Seller's rights, title, and interest in and to the Intellectual Property are transferred to Purchaser or its designee.

(xi)    Miscellaneous Assignments.    Any miscellaneous requirements required by Purchaser to convey and assign the Acquired Assets.

(xii)    Resolutions.    Certified resolutions and such other documents, instruments, and affidavits as may reasonably be required by the Title Company as a precondition to issuing the Title Policies, evidencing the authority of Sellers to enter into and perform this Agreement and to perform Sellers' obligations hereunder.

(xiii)    Keys.  All keys to all locks related to any of the unsold Timeshare Interests and the other acquired Real Property, together with an accounting, to the best of Sellers' knowledge, of all such keys in the possession, custody, or control of any other person or entity shall be made available to Purchaser at Sellers' premises.

(xiv)    Club Estoppel Certificate.  An Estoppel Certificate from the Club related to the payment of Assessments as described in the Membership Plan substantially in the form of Exhibit J hereto

(xv)    Settlement Statement and Closing Documents.    A counterpart, executed by each Seller, of a statement describing in detail the consideration, prorations, adjustments, costs, and expenses associated with the transaction contemplated hereby (the "Settlement Statement").

(xvi)    Notice of Resignation.    A notice of resignation from each respective board member of the Club and the Homeowner Associations in the form of Exhibit K hereto.

(xvii)  <u>Declaration of Deannexation</u>.  A Declaration of Deannexation in substantially the form of <u>Exhibit L</u> shall have been recorded in Maricopa County and a copy delivered to the Arizona Department of Real Estate concerning those certain units within the Club located in Varsity Clubs of America – South Bend Chapter to clarify certain inventory matters.

(xviii) Other Documents.  Such other documents and instruments as are contemplated hereunder or as may be reasonably required by Purchaser, its counsel, its lender, or the Title Company as reasonably necessary or appropriate to consummate the Transactions, to issue the Title Policies and otherwise to effectuate the agreements of the parties hereto.

(b)  Documents Delivered by Purchaser.  Purchaser shall deliver the following to Sellers on the Closing Date, each in form and substance satisfactory to Sellers:

(i)  Purchase Price.  The Purchase Price, pursuant to Section 2.5 hereof, less the amount of the Earnest Money Deposit, together with any interest accrued thereon.

(ii)  Settlement Statement.  A counterpart, executed by Purchaser, of the Settlement Statement.

(iii)  Resolutions.  Certified resolutions and such other documents, instruments, and affidavits as may be required by the Title Company, evidencing the authority of Purchaser to enter into and perform this Agreement and to perform Purchaser's obligations hereunder.

(iv)  Other Documents.  Such other documents and instruments as are contemplated hereunder or as may be reasonably required by Seller, its counsel, or the Title Company, as applicable, and reasonably necessary or appropriate to consummate the Transaction and to otherwise effectuate the agreements of the parties hereto.

6.5  Post-Closing Transactions.  Simultaneously with the Closing or immediately thereafter, Purchaser may take the following actions in its sole and subjective discretion.

(a)  Execute and deliver an Amendment to the Membership Plan converting the Club into a points based program in accordance with Section 7.02 of the Membership Plan.

(b)  Execute and deliver an Affiliation Agreement with THE Club® whereby the Club and/or its Members become affiliated with the exchange company commonly known as THE Club®.

(c)  Prepare and send a Notice of Seller and Occupancy Rights concerning the Club concerning the Purchaser's use and occupancy rights associated with the unsold Timeshare Interests, Assignment of Seller's Rights, future deannexation rights of the Purchaser concerning the Club and the unsold Timeshare Interests and such related

provisions as Purchaser shall determine are necessary to manage and operate the Club, which Notice may be recorded by Purchaser in every county where a Resort is located.

(d)     Prepare and have executed resolutions of the appropriate boards of directors of the Club and the Homeowner Associations appointing new directors as Purchaser shall determine in its sole and subjective discretion.

(e)     Prepare such additional documents, notices and agreements and do such other acts as may be reasonably necessary to fully implement the intent of this Agreement and to perfect and preserve the rights and interests of Purchaser under the Membership Plan and the priority thereof.

(f)     Record all Assignments of Declarants' Rights set forth in Section 6.4(a)(ix) in the applicable counties where the Resorts are located.

(g)     Prepare and have executed a Declaration of Annexation to Membership Plan annexing the Timeshare Property into the Club, if necessary or desirable.

## ARTICLE 7.
## TERMINATION

7.1     Termination.  This Agreement may be terminated at any time:

(a)     by mutual written consent of the Parties;

(b)     by either Party if (i) there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or (ii) any judgment, injunction, order, or decree of any Governmental Authority having competent jurisdiction enjoining Purchaser and Sellers from consummating the Transaction is entered and such judgment, injunction, or order shall have become final and non-appealable;

(c)     by either Party upon the occurrence of a material breach of any representation, warranty, or covenant in this Agreement by the other Party if such breach is not cured within thirty (30) days following written notice by the non-breaching Party which notice shall describe the breach; provided, however, such thirty (30) day period shall be extended to ninety (90) days if the breach by its nature cannot be cured within such thirty (30) day period and if the breaching Party promptly commences to cure the breach within such thirty (30) day period and continues to proceed thereafter with reasonable diligence; and

(d)     by either Sellers or Purchaser, if Purchaser's bid is not the Successful Bid at any Auction.

7.2     Effect of Termination.  In the event of a termination of this Agreement, neither Party shall have any liability or further obligation to the other, except that:

(a)     nothing herein will relieve a Party from liability for any breach by such Party of this Agreement; and

# EXHIBIT A

(b)     Sellers will, within ten (10) business days immediately following the termination of this Agreement, refund to Purchaser an amount equal to the Earnest Money Deposit; provided, however, that in the event that such termination is the result of Purchaser's willful misconduct, such Earnest Money Deposit will be retained by Sellers.

## ARTICLE 8.
## SURVIVAL AND REMEDIES

8.1     Survival.  With the exception of those representations and warranties set forth in Sections 3.1, 3.2, 3.3, and 4, the representations and warranties contained in this Agreement or in any certificate or other document delivered hereto or in connection herewith and the covenants and agreements contained herein to be performed or complied with prior to Closing shall expire upon the Closing.  The provisions of Articles 7, 8, and 10 shall survive the termination of this Agreement.  Whether or not Closing occurs, all costs and expenses incurred in connection with this Agreement and the Transactions shall be paid by the Party that incurred such costs, other than as specified in Section 10.7.

8.2     Brokers; Finders.  Seller and Purchaser represent and warrant to each other that neither has contacted any real estate broker, finder, or other party in connection with this transaction, to whom any real estate brokerage, finder, or other fees may be due or payable with respect to the transaction contemplated hereby.  Seller and Purchaser hereby indemnify and agree to hold each other harmless from any loss, liability, damage, cost, or expenses (including reasonable attorney's fees) related to anyone claiming a commission or fee with respect to the sale of the Acquired Assets as a result of any statement, agreement, or other alleged act of the other.

8.3     Remedies.  IN NO EVENT SHALL ANY PARTY BE LIABLE FOR INDIRECT, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING OUT OF A BREACH OF THIS AGREEMENT, EVEN IF ADVISED AT THE TIME OF BREACH OF THE POSSIBILITY OF SUCH.

8.4     Prior Knowledge.  Neither Party may assert a claim based on a breach of a representation or warranty or covenant if the Party to asserting such claim had knowledge of such breach prior to the Effective Date hereof.

## ARTICLE 9.
## BANKRUPTCY COURT APPROVAL; SALE SUBJECT TO HIGHER AND BETTER OFFERS; OTHER

This Agreement and the Transactions are subject to the approval of the Bankruptcy Court as provided in this Agreement, the entry of the Sale Order, and an order confirming the joint plan of reorganization by the Bankruptcy Court.

9.1     Interim Procedures and Sale Order; Hearing Dates.  Concurrently with, or shortly after, the filing of the joint disclosure statement proposed by Textron and Sellers, Sellers shall file a motion with the Bankruptcy Court (the "Sale Motion"), and shall use all commercially reasonable efforts to obtain, the entry of an order (the "Procedures Order"), in form and substance acceptable to Purchaser and in substantially the form of Exhibit M attached hereto: (a)

28

approving, at an interim hearing (the "Procedures Hearing") held concurrently with the hearing on the adequacy of the disclosure statement set by the Bankruptcy Court, the Bidding Procedures described in Section 9.3 of this Agreement; (b) designating the time, date and location of the Auction; (c) approving the Break-Up Fee; (d) requesting a hearing to be held (the "Sale Hearing") on a date (the "Sale Hearing Date") concurrent with the final hearing on confirmation of the joint plan of reorganization proposed by Textron and Sellers, at which Sellers shall seek the approval of the terms of this Agreement and the sale of the Acquired Assets to, and the purchase of the Acquired Assets by, Purchaser, together with any and all related relief (including, without limitation, the authority to assume and assign to Purchaser executory contracts and unexpired leases), subject to (i) further notice of the sale to interested parties as described in the Bidding Procedures, and (ii) if necessary, the Auction described in the Bidding Procedures. The approval of the Bidding Procedures substantially in the form as outlined in this Agreement shall be a condition precedent to the Purchaser's obligation to consummate the Transactions. On the Sale Hearing Date, the Bankruptcy Court shall preside over the hearing to approve this Agreement, subject to the conduct of the competitive bidding process as described in and approved by the Procedures Order. In the event that Purchaser's bid is the Successful Bid at such hearing or there are no other Qualifying Bids, then Sellers shall request the Bankruptcy Court enter the Sale Order.

9.2     Omitted.

9.3     Bidding Procedures. The Parties agree that they will use commercially reasonable efforts to seek entry of the Procedures Order that provides the following (the "Bidding Procedures"):

(a)     After the entry of the Procedures Order, the Sellers shall serve a notice acceptable to Sellers, Textron, and Purchaser (the "Sale Notice"), by first-class mail, postage prepaid, upon (i) all counterparties to executory contracts and unexpired leases that will be assumed in connection with the Transactions; (ii) all parties that have requested notice in the Bankruptcy Case pursuant to Federal Rule of Bankruptcy Procedure 2002; (iii) the Office of the United States Trustee for the District of Arizona; (iv) counsel to Textron; (v) counsel to the Purchaser; (vi) all entities known to have expressed an interest in a transaction with respect to all or substantially all of the Acquired Assets during the past year from the date of this Agreement; (vii) all Taxing Authorities in which Sellers have filed Tax Returns during the past two (2) years from the date of this Agreement; (viii) all parties asserting a Lien on any of the Acquired Assets; (ix) all creditors with filed or scheduled claims against the Sellers in the Bankruptcy Case; (x) the Arizona Department of Real Estate; and (xi) all members of the Club and parties otherwise owning a Timeshare Property in which a Seller is declarant; which Sale Notice may include the following as mutually agreed by the Parties or by order of the Bankruptcy Court: (a) this Agreement or information giving recipients access to this Agreement; (b) the Sale Motion; (c) the Procedures Order; (d) notice of any cure amounts payable by Sellers pursuant to the assumption and assignment of executory contracts and unexpired leases in connection with the Transactions; and (e) notice that counterparties to executory contracts and unexpired leases to be assumed and assigned must file an objection to the assumption and assignment of such executory contracts and unexpired leases or cure amounts by no less than five (5) Business Days prior to the Sale Hearing or

be estopped from objecting to such assumption and assignment and any cure amounts to be paid in connection therewith.

(b)     Any person wishing to participate in the Auction must submit a Qualifying Bid.  This Agreement constitutes a Qualifying Bid from Purchaser.

(c)     All Qualifying Bids must be submitted no later than 4:00 p.m. prevailing Phoenix time on a date that is not less than five (5) Business Days prior to the Sale Hearing to Sellers' counsel, Polsinelli Shughart PC, Security Title Plaza, Suite 1200, 3636 N. Central Avenue, Phoenix, AZ 85012, Attention: John J. Hebert, Esq. (Fax no.: (602) 264-7033 or email: jhebert@polsinelli.com), and counsel to Textron, Fennemore Craig PC, 3003 N. Central Ave., Suite 3600, Phoenix, AZ 85012, Attention:  Cathy L. Reece, Esq., (Fax no: (602) 916-5543 or email: creece@fclaw.com) and must:

(i)     submit a signed asset purchase agreement (together with a copy that is marked to show changes from this Agreement) with, at a minimum, the following requirements: (a) having substantially identical terms and conditions as this Agreement, except that the purchase price shall be at least Three Hundred Thousand Dollars ($300,000) higher than aggregate of the Purchase Price and the Break-Up Fee; (b) containing terms and conditions no less favorable to the Sellers' estates than the terms and conditions in this Agreement; (c) the agreement shall not be subject to any contingency, other than approval of the Bankruptcy Court; (d) a written statement by the bidder stating that it agrees to be bound by the terms and conditions of this Agreement and close on the sale within the time periods set forth in this Agreement; (e) designating the executory contracts and unexpired leases as to which the bidder seeks assumption by the Sellers and assignment to the bidder and any other assets of the Sellers that are subject to the bid; and (f) be accompanied by the Deposit defined below;

(ii)     include an amount equal to ten percent (10%) of the purchase price as a deposit ("Deposit").  The Deposit shall be delivered to the Sellers' counsel in certified funds, and shall be accompanied by a written acknowledgement that if such bid is the Successful Bid, then the Deposit shall immediately become non-refundable; and

(iii)     include information reasonably sufficient to confirm the bidder's financial wherewithal to close, including proof of financing and ability to close.

(d)     Sellers shall promptly provide Purchaser copies of all Qualifying Bids received by Sellers.

(e)     In the event that Sellers receive any Qualifying Bids in addition to that from Purchaser, Sellers, in consultation with Textron, shall designate a Qualifying Bid that is highest and best (the "Designated Bid").  The Sellers shall conduct an auction (the "Auction") at the Bankruptcy Court or such other location as Sellers may reasonably designate on the Sale Hearing Date for all of the Acquired Assets, using the Designated Bid as the starting bid.  All parties submitting Qualifying Bids, including Purchaser, shall

be entitled to make higher and better bids at the Auction, provided that all subsequent bids shall be made in aggregated increments of at least Two Hundred Thousand Dollars ($200,000) in net value to Sellers, and on such terms as may be ordered by the Bankruptcy Court. The Auction will be conducted openly and each bidder will have full knowledge of the terms of all prior bids. The Auction shall continue until such time as there is only one offer determined by Sellers to be the highest and best offer for the Acquired Assets (the "<u>Successful Bid</u>"). In determining the Successful Bid, Sellers, in consultation with Textron, shall analyze and consider, without limitation, the amount and form of consideration being offered, the certainty and timing of closing, and any material modifications to the terms and conditions of this Agreement. If a dispute arises at the Auction, the Bankruptcy Court shall determine the highest and best offer.

9.4     <u>Break-up Fee</u>. In the event that on the Sale Hearing Date, a purchaser other than the Purchaser is approved by the Bankruptcy Court as the purchaser for the Acquired Assets, and the Acquired Assets are subsequently sold to such other purchaser, Purchaser shall, upon Bankruptcy Court approval, be paid at Closing from the proceeds of such sale of the Acquired Assets, an amount equal to One Percent (1%) of the Purchase Price as an incentive to serve as the stalking horse bidder as to the Acquired Assets and as reimbursement for all of Purchaser's expenses incurred in pursuing the acquisition (the "<u>Break-Up Fee</u>"). The Sellers shall use reasonable efforts to cause the Break-up Fee to be granted administrative expense status in the Bankruptcy Case, subordinate only to (i) any debtor-in-possession financing and (ii) adequate protection provided to the Sellers' prepetition secured lenders and secured by assets of the Sellers with such claims and liens to be senior on all unencumbered assets but junior on all encumbered assets. The Bankruptcy Court's approval of the Break-Up Fee shall be a condition to the Purchaser's obligation to consummate the Transactions. If a Sale Order is entered approving the sale to any purchaser other than the Purchaser, each Party shall be fully released and discharged by the other Party from any liability or obligations arising under or relating to this Agreement, and neither Party shall have any other remedy or cause of action under, or relating to, this Agreement or any applicable Law.

9.5     <u>Disclosure Statement; Confirmation Order</u>. The Sellers and Textron shall consult with Purchaser concerning the disclosure statement, joint plan of reorganization and confirmation order and provide Purchaser with copies of such documents as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. The confirmation order submitted to the Bankruptcy Court shall specifically find that the sale of the Acquired Assets is free and clear of any stamp or similar Taxes under section 1146(c) of the Bankruptcy Code.

**ARTICLE 10.**
**MISCELLANEOUS**

10.1     Entire Agreement. This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties with respect to the subject matter hereof and thereof.

10.2     Amendments and Waivers. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed (in the case of an

31

# EXHIBIT A

amendment) by all of the Parties hereto or (in the case of a waiver) by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

10.3    Remedies Cumulative.  Except as otherwise provided herein, all rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise or beginning of the exercise of any thereof by a Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

10.4    Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  This Agreement may not be assigned by either Party without the prior written consent of the other Party.

10.5    Notices.  All notices or other communications hereunder shall be in writing and shall be deemed to have been duly given or made (a) upon delivery if delivered personally (by courier service or otherwise), as evidenced by written receipt or other written proof of delivery (that may be a printout of the tracking information of a courier service that made such delivery), or (b) upon confirmation of dispatch if sent by facsimile transmission (which confirmation shall be sufficient if shown by evidence produced by the facsimile machine used for such transmission), in each case to the applicable addresses set forth below (or such other address that either Party may from time to time specify):

| | |
|---|---|
| If to Sellers: | ILX Resorts Incorporated<br>2111 E. Highland Avenue, Suite 200<br>Phoenix, AZ  85016<br>Attention: Nancy J. Stone<br>Fax: (602) 957-2780 |
| With a copy to: | Polsinelli Shughart PC<br>3636 North Central Avenue, Suite 1200<br>Phoenix, AZ  85012<br>Attn. John J. Hebert<br>Fax: (602) 264-7033 |
| If to Purchaser: | ILX Acquisition, Inc.<br>10600 West Charleston Boulevard<br>Las Vegas, NV 89135<br>Attn: David Palmer<br>Fax: (702) 765-8794 |
| With a copy to: | Katten Muchin Rosenman LLP<br>525 W. Monroe St.<br>Chicago, IL  60661-3693<br>Attn: Peter A. Siddiqui |

32

# *EXHIBIT A*

Fax: (312) 577-4628

And            Ballard Spahr LLP
                             201 S. Main Street, Suite 600
                             Salt Lake City, Utah 84111
                             Attn: Steven D. Peterson
                             Fax: (801) 531-3001

       10.6      Governing Law; Jurisdiction; Forum; Waiver of Jury Trial. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Arizona, without reference to the choice of law principles thereof. Each Party hereto irrevocably consents to the exclusive jurisdiction and venue of any court within Maricopa County, Arizona, in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the laws of the State of Arizona for such persons and waives and covenants not to assert or plead any objection that they might otherwise have to such jurisdiction, venue or process. THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

       10.7      Expenses. Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each Party shall bear its own expenses (including, but not limited to, all compensation and expenses of counsel, financial advisors, consultants, actuaries, and independent accountants) incurred in connection with this Agreement and the Transactions; provided, however, that Sellers shall be responsible for all closing costs and Tax obligations incurred by Sellers on or before the Closing Date (including, but not limited to transfer Taxes, sales Tax and income Taxes but excluding real and personal property Taxes due in calendar year 2010 and thereafter).

       10.8      Sale, Not Assignment of Acquired Assets. Sellers and Purchaser intend that the Transactions shall be the purchase and sale of Acquired Assets and not the assignment thereof as security. Each party hereby agrees to take actions necessary to cause the Transactions to be treated as a sale.

       10.9      Invalidity. In the event that any of the provisions contained in this Agreement or in any other instrument referred to herein, shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement or such other instrument and such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, unless the consummation of the Transactions is impaired thereby.

       10.10     Conflicts. To the extent that any terms or provisions of this Agreement modify or conflict with any provisions of governing state law, the terms of this Agreement shall control.

       10.11     Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

33

# *EXHIBIT A*

10.12 Headings. The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

[SIGNATURE PAGES FOLLOW]

2680546.2

# *EXHIBIT A*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**SELLERS**:

ILX Resorts Incorporated

By: _____
Name: Nancy J. Stone
Title: Vice Chairman and President


ILE Sedona Incorporated

By: _____
Name: Nancy J. Stone
Title: Vice President


ILX Tourist Station Incorporated

By: _____
Name: Nancy J. Stone
Title: President


ILX Bruno LLC

By: _____
Name: ILX Resorts Incorporated
By: Nancy J. Stone
Its: Vice Chairman and President


Los Abrigados Partners Limited Partnership

By: _____
Name: ILE Sedona Incorporated
Title: General Partner
By: Nancy J. Stone
Its: Vice President


SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

# *EXHIBIT A*

Genesis Investment Group, Inc.,

By: _____
Name:  Nancy J. Stone
Title:  Vice President

Puerto Peñasco Vacation Destinations, S. de
R.L. de C.V.

By: _____
Name:  Nancy J. Stone
Title:  General Manager

Premiere Development Incorporated

By: _____
Name:  Nancy J. Stone
Title:  President

Sea of Cortez Premiere Vacation Club S. de
R.L. de C.V.

By: _____
Name:  Joseph P. Martori
Title:  President

Rocky Point Genesis Incorporated

By: _____
Name:  Nancy J. Stone
Title:  Vice President

VCA Tucson Incorporated

By: _____
Name:  Nancy J. Stone
Title:   Vice President

<u>SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT</u>

# *EXHIBIT A*

VCA South Bend Incorporated

By: _____
Name:  Nancy J. Stone
Title:  Vice President


VCASB Partners General Partnership

By: _____
Name:  ILX Resorts Incorporated
Its: General Partner
By:      Nancy J. Stone
Its:      Vice Chairman and President


First Piggy LLC

By: _____
Name:  Nancy J. Stone
Title:  Vice Chairman and President


Harbor Southwest Development, Inc.

By: _____
Name:  Nancy J. Stone
Title:  Vice President


ILX Bell Rock Incorporated.

By: _____
Name:  Nancy J. Stone
Title:  President


<u>SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT</u>

# *EXHIBIT A*

**PURCHASER**:

ILX Acquisition, Inc.

By: _____
Name: _____
Title: _____

<u>SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT</u>

# *EXHIBIT A*

## <u>LIST OF EXHIBITS</u>

Exhibit A            Sale Order
Exhibit B            Special Warranty Deed for Timeshare Property
Exhibit C            Bill of Sale
Exhibit D            Special Warranty Deed for Unsold Timeshare Interests
Exhibit E            Master Assignment and Assumption of Management Agreements
Exhibit F            Master Assignment of Timeshare Loans
Exhibit G            Certificate of Timeshare Loans
Exhibit H            Assignment of Declarants' Rights
Exhibit I            Assignment of Intellectual Property
Exhibit J            Estoppel Certificate
Exhibit K            Resignations
Exhibit L            Declaration of Deannexation
Exhibit M            Procedures Order

# *EXHIBIT A*

## LIST OF SCHEDULES

Schedule 1(a)            Copyrights
Schedule 1(b)            Domain Names and Websites
Schedule 1(c)            Patents
Schedule 1(d)            Resorts
Schedule 1(e)            Timeshare Loans
Schedule 1(f)            Trade Names and Trademarks
Schedule 1(g)            Vehicles

Schedule 2.1(i)(1)       Executory Contracts
Schedule 2.1(i)(2)       Property Management Agreements
Schedule 2.1(ii)(1)      Resort Funding LLC Holdbacks and Loans
Schedule 2.1(ii)(2)      Pre-Petition Ineligible Receivables
Schedule 2.1(iii)        Unsold Timeshare Interests
Schedule 2.1(iv)         Real Property and Leases
Schedule 2.1(v)          Rights Documents

Schedule 2.2(i)          Merchant Deposits
Schedule 2.2(iii)        USFS Parcel A Legal Description
Schedule 2.2(iv)         USFS Parcel B Legal Description
Schedule 2.2(v)          Bullhead City Legal Description
Schedule 2.2(vi)         Rocky Point Legal Description
Schedule 2.2(vii)        USFS Parcel B Portion Legal Description
Schedule 2.2(viii)       Mormon Hill Road Legal Description
Schedule 2.2(x)          Resort Funding LLC Holdbacks

Schedule 2.3(iii)        Obligations of Sellers Assumed by Purchaser
Schedule 2.3(iv)         Existing Reservations
Schedule 2.3(v)          M&I Bank Liabilities

Schedule 2.7(ii)         Title Exceptions

Schedule 3.4             Ownership
Schedule 3.6             Assessments
Schedule 3.8             Material Affect on Operations
Schedule 3.9             Compliance